Barbara GESS, et al., Joseph Givens, et al., Patrick G. Roberts, et al., Teresa Fowler, et al., David Barber, et al., Jay Dehaai, et al., Cheryl Pretiger Toms, et al., Alphonso Barnes, et al., Joseph Warrick, et al., Connie Mullen, et al., Donald Gregory Sharpe, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Nos. Civ.A. 93–D–0913–N, Civ.A. 93–D–1140–N, Civ.A. 93–D–1391–N, Civ.A. 93–D–1392–N, Civ.A. 93–D–1393–N, Civ.A. 93–C–1394–N; Civ.A. 94–D–1395–N, Civ.A. 94–D–0326–N, Civ.A. 94–D–1199–N, Civ.A. 94–D–1200–N, Civ.A. 94–D–1201–N.

United States District Court,
M.D. Alabama,
Northern Division.

Sept. 17, 1997.

George L. Beck, Jr., Montgomery, AL, for Plaintiffs.

Redding Pitt, U.S. Atty., Kenneth E. Vines, Asst. U.S. Atty., Gail K. Johnson, Heather S. Call, U.S. Dept. of Justice, Washington, D.C., for Defendant.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

In this action, plaintiffs Seek to recover from the defendant for injuries they suffered while patients in the care of Air University Regional Hospital at Maxwell Air Force Base ("Maxwell Hospital") in Montgomery, Alabama. The Court bifurcated the proceedings in this matter and heard evidence on the issues of duty and breach during a bench trial held during July 8 – 12, 1996. In the Court's December 12, 1996, Memorandum Opinion and Order, the Court found that the defendant owed the plaintiffs both a general duty of care and a duty to protect them from the criminal acts of third parties, and that the defendant had breached these duties. *See Gess v. United States,* 952 F.Supp. 1529, 1552–60 (M.D.Ala.1996). As a foreseeable result of defendant's breach, a disturbed medical aide, Michael Beckelic, "tampered" with each of the eleven child-plaintiffs and the adult plaintiff, Cheryl Schoen, either by injecting them with lidocaine or by harming them in some other manner. *Id.* at 1539–49.

The parties presented the second half of the evidence in this case between August 4, 1997, and August 8, 1997. In this second phase of the trial, the Court must address two issues. First, the Court must determine what specific injuries, if any, the plaintiffs have suffered and/or continue to suffer. Second, the Court must determine which, if any, of these specific injuries were proximately caused by defendant's breach. More precisely, the Court must determine which of the plaintiffs' injuries were proximately caused by Beckelic's "tampering." The plaintiffs cannot recover unless a preponderance of the evidence demonstrates that they have injuries and that these injuries were proximately caused by Beckelic's "tampering." *See Ranger Ins. Co. v. Hartford Steam Boiler Inspection & Ins. Co.,* 410 So.2d 40, 41 (Ala. 1982).

Before turning to these questions, however, the Court must first address two preliminary matters. First, defendant argues that the testimony of plaintiffs' expert, Dr. Richard Colan, must be excluded on the issue of causation because it does not comport with the standards established in *Daubert v. Mer-*

*rell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Second, defendant contends that the majority of the plaintiffs cannot recover because their claims are barred by the statute of limitations.

### Admissibility of Dr. Colan's Testimony

In *Daubert*, the Supreme Court held that Rule 702 [1] of the Federal Rules of Evidence governs the admission of expert testimony. *Id.* 509 U.S. at 589. With regard to scientific testimony, the Court held that, under Rule 702, the testimony must be both reliable and relevant to be admissible. *Id.* Testimony which amounts to speculation or merely reflects an expert's subjective belief is not admissible under Rule 702. *Id.* at 590. On the other hand, scientific testimony does not have to be known to a certainty to be admissible; rather, it must be derived by the scientific method from what is known. *Id.*

■ When expert scientific testimony is proffered, the district court's task is to determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592 (footnote omitted). This inquiry requires the court to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and [ ] whether that reasoning or methodology can be applied to the facts in issue." *Id.* at 592–93.

■ In *Joiner v. General Elec. Co.*, 78 F.3d 524 (11th Cir.1996), the Eleventh Circuit held that under the first prong of *Daubert*:

> [T]he district court must examine the reasoning or methodology underlying the expert opinion to determine whether it utilizes valid scientific methods and procedures. Trial judges must evaluate scientific processes and studies with which they may not be intimately familiar, but be careful not to cross the line between deciding whether the expert's testimony is based on "scientifically valid principles" and deciding upon the correctness of the expert's conclusions.

*Id.* at 530. In *Daubert*, the Supreme Court identified several factors which may assist the district court to determine whether a given scientific theory or study is reliable. These factors include: (1) whether the theory can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the method is generally accepted in the scientific community. 509 U.S. at 593–94. The Court emphasized that the district court's inquiry must be a flexible one. *Id.* at 594. Indeed, "[t]hese factors are neither exhaustive nor applicable in every case." *Joiner*, 78 F.3d at 530 (citing *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742 (3d Cir.1994)). Finally, the *Joiner* Court reemphasized the role of the trial court:

> the gatekeeping responsibility of the trial courts is not to weigh or choose between conflicting scientific opinions, or to analyze and study the science in question in order to reach its own scientific conclusions from the material in the field. Rather, it is to assure that an expert's opinions are based on relevant scientific methods, processes, and data, and not mere speculation, and that they apply to the facts at issue.

*Id.* at 530.

■ In the instant case, defendant argues that Dr. Colan's testimony on causation should be excluded because it is unreliable. Accordingly, the Court must first identify the basis of Dr. Colan's testimony and then decide whether the methods, procedures and information used by Dr. Colan to reach his conclusions are scientifically reliable. *Id.* at 530–31.

Dr. Colan's testimony on causation was based on the following: (1) a review of each plaintiff's medical records; (2) a review of the medical records of other patients at Maxwell Hospital who suffered similar symptoms but who are not plaintiffs in this suit; (3) physical examinations of each plaintiff; (4) a review of the findings and conclusions of the other doctors and investigators who reviewed these cases; (5) a review of literature per-

---

1. Rule 702 provides:

 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

taining to lidocaine and its chemistry and effects on human beings and the available literature on whether and how lidocaine can injure the central nervous system; (6) his training through medical school and residency; and (7) his extensive experience in treating and diagnosing patients suffering from neurological disorders.

Dr. Colan admits that there are no clinical studies which conclusively establish that exposure of neonates to toxic doses of lidocaine causes long-term health effects. Nor will there be any according to Dr. Colan. Such a study would be unethical under the tenets of modern medicine. However, as the *Daubert* Court noted, the subject of an expert's testimony need not be known to a certainty for that testimony to be admissible. 509 U.S. at 590. For Dr. Colan's testimony to be admissible, he must take **what is known,** however large or small that body of knowledge may be, and draw his conclusions from that knowledge using the scientific method. *See id.*

What, then, did Dr. Colan know? To begin, he knew that the eleven child plaintiffs and the one adult plaintiff exhibited a similar core of symptoms after they were "tampered" with by Beckelic. These symptoms included bradycardia, acidosis, apnea, hyperglycemia and cyanosis. Ex. 8 attached to Colan Dep. of 6/6/94. With the exception of Goggans, each of the plaintiffs exhibited most, if not all, of these symptoms. *Id.* Dr.

Colan testified that a toxic dose of lidocaine could cause all of these symptoms. Colan Dep. of 7/22/96 at 37. Significantly, while there are many potential causes for any one of these symptoms, Dr. Colan's training, experience and research led to him to conclude that, of the potential causes identified, only lidocaine would create this combination of core symptoms. *Id.* at 107–08; Colan Dep. of 3/3/94 at 148. Additionally, Dr. Colan knew that lidocaine was easily accessible at Maxwell Hospital, that an empty vial of lidocaine had been found in the hospital nursery and that one of the plaintiffs, Sharpe, had tested positive for lidocaine.[2]

Second, Dr. Colan reviewed all of the literature[3] he could find pertaining to the effects of lidocaine poisoning on the central nervous system. One group of animal studies reviewed by Dr. Colan revealed that pre-term rats, exposed to lidocaine during the latter stages of the dam rats' pregnancies, suffered permanent impairment of their intelligence, attention and response. A second study found that nerve cells, in their rapid growth stage, are blighted and distorted by lidocaine.[4] A third animal study showed that the actual function of nerve cells is decreased or impaired when they are exposed to lidocaine.

As mentioned earlier, Dr. Colan did not have any studies looking into the long-term effects of toxic doses of lidocaine on neonates.[5] Dr. Colan did, however, find articles discussing the effects of neonate exposure to

2. The parties dispute whether the lidocaine detected in Sharpe's urine is explained by the fact that Sharpe's mother received an injection of lidocaine during delivery. Dr. Colan concedes that the injection given to the mother could explain the presence of lidocaine in Sharpe's urine. Colan Dep. of 7/22/96 at 115.

3. Dr. Colan testified that, to the best of his knowledge, all of the articles he relied upon to formulate his opinion were peer-reviewed. Colan Dep. of 7/22/96 at 61.

4. Dr. Colan opined that these two animal studies were particularly significant in that they explained how the effects of lidocaine poisoning on an adult or older child would differ from the effects on a neonate. According to Dr. Colan, a neonate who receives a toxic dose of lidocaine is likely to suffer nerve damage because a neonate's nervous system is in a state of rapid development. On the basis of these studies and his other research, Dr. Colan has concluded that lidocaine does not kill brain cells, but instead, impairs

their development. Therefore, once a child moves beyond the state of rapid nervous system development, Dr. Colan believes that a toxic dose of lidocaine is less likely to damage the child's nervous system. Colan Dep. of 3/3/94 at 170–71; Colan Dep. of 6/6/94 at 56–57.

5. To support its argument that lidocaine poisoning does not cause negative long-term health effects, the defendant points to an article entitled "Accidental Lidocaine Overdose in an Infant" by A.P. Jonville, *et al.* This article reported the effects of accidental lidocaine poisoning of a one month old child and a six year old child. The authors concluded that the one month old child's recovery was complete. However, the authors did not do any long-term follow-up investigation of the child's health. Dr. Colan explained that damage to the central nervous system of a neonate may be undetectable until the child reaches several years of age. Therefore, the Court accords little weight to this article on the issue of whether lidocaine poisoning can cause negative long-term health effects.

non-toxic doses of lidocaine. The articles reported that neonates exposed to anesthetics (lidocaine) behaved differently than neonates not exposed to lidocaine. One study which tracked neonates who had been exposed to lidocaine through the age of four found that the children's ability to stop responding to redundant or distracting stimuli was impaired and that their cognitive and language skills were impaired as they grew older.

Equally important, according to Dr. Colan, was the fact that there were no articles or studies which concluded that exposure to lidocaine, in either toxic or non-toxic doses, does not cause damage to the nervous system. Although there were few studies of the effects of lidocaine on the nervous system, Dr. Colan believed it significant that all of the studies wherein there was a critical evaluation of the effects of lidocaine exposure on neonates suggested that nervous system damage could result.

Finally, Dr. Colan knew that the plaintiffs, as a group, displayed remarkably similar behavioral, cognitive and physical impairments. Dr. Colan's physical examinations and review of the plaintiffs' medical records revealed a group of individuals who had one common experience in life, lidocaine poisoning, and who all displayed some form of central nervous system damage. Common sense, as much as scientific deduction, allows one to draw an inference from such evidence.[6]

Again, Dr. Colan freely admits that little research has been done on the effects of lidocaine poisoning on the central nervous system.[7] The Court does not believe, however, that the novelty of this area of research should render Dr. Colan's testimony inadmissible. It would be truly unjust to say to a group of plaintiffs, "You cannot recover because no deviant person has, as yet, attempted to poison infants with lidocaine, but don't worry, after you, the next group of unlucky souls will be able to recover." Holding Dr. Colan's testimony inadmissible because there is no conclusive clinical research to support his theory would send just that message.

As the *Daubert* Court noted, the district court's inquiry must be a flexible one focusing on the reliability of the expert's methodology rather than the certainty of his or her conclusions. 509 U.S. at 594–95. Here, Dr. Colan is unable to compare and contrast his theory to a body of clinical research, he is unable to recruit a group of subjects to test his theory, and while he may at some future date, he has not had time to publish his theory or seek the general acceptance of the scientific community. What he has done, however, is gather all available medical information about the plaintiffs, research the effects and chemistry of lidocaine on the human body, read every available article on the long-term impact of lidocaine exposure, consider potential alternate causes of plaintiffs' injuries and, applying his own knowledge of the central nervous system and extensive experience diagnosing and treating central nervous system disorders, conclude to a reasonable degree of medical certainty that certain of plaintiffs' injuries were caused by lidocaine. Given all this, the Court cannot find that Dr. Colan's testimony on causation represents mere speculation or subjective personal belief.[8] *See Joiner,* 78 F.3d at 532–

---

6. One thing Dr. Colan did not know was the precise dose of lidocaine that the plaintiffs received. Defendant argues that this fact should render Dr. Colan's testimony inadmissible. The Court disagrees. Although Dr. Colan does not know how much lidocaine the plaintiffs were given, he does know that it was a toxic dose—that is, it was enough to cause the plaintiffs to experience an acute life threatening event. Some of the literature Dr. Colan relied on suggested that lidocaine exposure in non-toxic doses could harm a neonate's central nervous system. Dr. Colan could reasonably extrapolate from this literature that exposure to a toxic dose would cause the same or more serious harm to plaintiffs' nervous systems. Moreover, the import of Dr. Colan's testimony is that lidocaine poisoning can cause central nervous system damage.

Whether a particular plaintiff was more or less poisoned is not relevant to this conclusion. Accordingly, the Court finds that uncertainty as to the precise doses of lidocaine plaintiffs received does not make Dr. Colan's causation testimony inadmissible.

7. In fact, Dr. Colan believes that these cases, the experiences of the plaintiffs, will make an important contribution to the scientific community's understanding of lidocaine and the potential harm it poses to the nervous system of neonates.

8. Despite the novelty of Dr. Colan's theory, for the reasons discussed above, the Court finds that Dr. Colan's testimony has sufficient indicia of reliability to "get through the gate." *See Joiner,* 78 F.3d at 530. Under the circumstances of the

33 (holding that expert testimony was reliable, and thus admissible, where experts gathered all relevant information and utilized extensive experience and specialized expertise to draw conclusions which were supported by a limited number of human and animal studies). Accordingly, the Court finds that, to the extent Dr. Colan has testified to a reasonable degree of medical certainty that certain of plaintiffs' injuries were caused by lidocaine poisoning,[9] his testimony is admissible.

**Statute of Limitations Defense**

The defendant contends that nine of the plaintiffs, Gess, Patrick Roberts, Fowler, Schoen, Sharpe, Warrick, Barber, Barnes and John Roberts, Sr., cannot recover because they failed to file their claims within the time-frame required by the applicable statute of limitations. 28 U.S.C. § 2401(b) provides in relevant part: "A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues."

█ Generally, a tort claim "accrues" at the time of the plaintiff's injury. *United States v. Kubrick*, 444 U.S. 111, 120, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). However, a medical malpractice claim under the Federal Tort Claims Act ("FTCA") does not accrue until the plaintiff (1) knows of the injury and (2) knows the cause of the injury or, in the exercise of due diligence, should discover the cause of the injury. *See Kubrick*, 444 U.S. at 122; *Burgess v. United States*, 744 F.2d 771, 773 (11th Cir.1984) (relying on *Urie v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949)); *see also Price v. United States*, 775 F.2d 1491, 1494 (11th Cir.1985) ("[A] medical malpractice claim under the FTCA accrues when the plaintiff is, or in the exercise of reasonable diligence should be,

aware of both her injury and its connection with some act of the defendant.").

Two Eleventh Circuit decisions illuminate issues which may arise from the application of the two-pronged *Kubrick* test. In *Burgess*, the court discussed the application of the first prong of *Kubrick*. In *Burgess*, the plaintiff's clavicles were broken at birth by his mother's physician in order to facilitate his delivery. *Id.* at 772. Plaintiff's parents were told by hospital physicians that plaintiff would fully heal. *Id.* However, approximately twenty days after being discharged from the hospital, plaintiff's parents learned that plaintiff had permanent nerve damage. *Id.* at 772–73.

The defendant in *Burgess* argued that the statute of limitations had begun running once the plaintiff's parents knew that defendant's agent had broken plaintiff's clavicles. *Id.* at 774. The court, however, disagreed with defendant and held that the relevant injury was the nerve damage suffered by the plaintiff, not his broken clavicles. Therefore, the court concluded, the statute of limitations did not begin running until plaintiff's parents learned of his nerve damage. The court explained:

> Although the injury to the brachial plexus occurred on September 5, 1978, when the infant's bones were broken, the record supports [plaintiff]'s contention that his parents were not aware of this injury and the resulting nerve damage until at least September 29, 1978. Nothing that [plaintiff]'s parents were told prior to that date would lead a reasonable person to suspect that the breaking of the clavicle would cause [nerve damage]. Rather, any information concerning the nerve damage was within the exclusive knowledge of the government's physicians at that time. The [plaintiff] acted reasonably in relying upon

instant case, the Court believes that the relatively small body of empirical support for Dr. Colan's theory goes to the weight to be accorded his testimony rather than its admissibility.

9. As part of defendant's argument to exclude Dr. Colan's testimony wholly, defendant points out that the plaintiffs have a number of alleged injuries which Dr. Colan could not, to a reasonable degree of medical certainty, link to lidocaine poisoning. The Court agrees that, to be relevant,

Dr. Colan's opinions must be based upon a reasonable degree of medical certainty. To this end, the Court will consider whether specific opinions express by Dr. Colan are held to a reasonable degree of medical certainty when it evaluates what causal link, if any, there is between each plaintiff's alleged injuries and lidocaine poisoning. Dr. Colan does, however, express many opinions to a reasonable degree of medical certainty, and the Court finds that testimony admissible.

the government's representations and assurances concerning [plaintiff]'s condition. Thus, since [plaintiff]'s parents did not know of the existence of the injury until the physicians made them aware of it on September 29, 1978, the statute of limitations commenced running at that time.

*Id.* at 774–75. The court further explained that the plaintiff's case was not one in which he simply did not know the extent or permanence of his injury. *Id.* at 775 n. 9. In such a case, the statute begins running upon the initial discovery of the injury. *See Robbins v. United States,* 624 F.2d 971 (10th Cir. 1980); *Hulver v. United States,* 562 F.2d 1132 (8th Cir.1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1576, 55 L.Ed.2d 800 (1978); *Ashley v. United States,* 413 F.2d 490 (9th Cir.1969). Rather, because the plaintiff's nerve damage was neither known nor reasonably discoverable at the time plaintiff's parents learned of plaintiff's initial injury, the nerve damage they later discovered constituted a separate injury for purposes of the statute of limitations. *See Burgess,* 744 F.2d at 775. Thus, *Burgess* teaches the Court that when applying the first prong of *Kubrick,* the Court must ask, "what is the relevant injury?"

The second prong of *Kubrick* was explored in *Chamness v. United States,* 835 F.2d 1350 (11th Cir.1988). In *Chamness,* the plaintiff was diagnosed as having numerous disabilities including profound mental retardation. *Id.* at 1352. The plaintiff's mother learned of plaintiff's injuries shortly after her birth, but claimed that she did not know the cause of plaintiff's injuries until the plaintiff was over three years old. *Id.* at 1353. Plaintiff's mother did, however, know that plaintiff's birth had been difficult and that she had been given various drugs to assist in the delivery. *Id.* at 1352.

The plaintiff's mother sought both medical and legal advice. Unfortunately, none of the professionals she consulted were able to diagnose the cause of plaintiff's injuries. In

fact, all of the doctors plaintiff's mother consulted informed her that plaintiff was simply a "statistical aberration." *Id.* Then, some thirty-seven months after plaintiff's birth, plaintiff's mother learned that one of the drugs she was given during delivery had probably caused plaintiff's mental retardation. *Id.* at 1353.

The *Chamness* Court noted that plaintiff's mother could not, without the advice of medical experts, determine the cause of plaintiff's retardation. *Id.* at 1353 n. 7. The court also observed that a plaintiff may reasonably rely on the advice and assurances of doctors when attempting to discover the cause of his or her injuries. *Id.* The court quoted from the Ninth Circuit's opinion in *Rosales v. United States,* 824 F.2d 799, 805 (9th Cir.1987): "Ordinarily, a plaintiff cannot be expected to discover the general medical cause of his injury even before the doctors themselves are able to do so." *Id.* However, the court concluded that because no doctor had actively misled the plaintiff's mother about the cause of plaintiff's injury, the statute of limitations was not automatically tolled. *Id.* Instead, the court held that there existed a question of fact as to whether plaintiff had exercised due diligence in uncovering the cause of her injuries. *Id.*

■■■ *Chamness* teaches the Court several things about the application of the second *Kubrick* prong. First, the Court should determine whether the injury is the type whose cause is apparent. If not, the plaintiff is entitled to rely upon the advice of doctors to determine the cause of his or her injury. Second, the Court must decide whether the plaintiff has been actively misled about the cause of his or her injuries. Such misinformation may act to toll the statute of limitations.[10] Finally, if the plaintiff has not been actively misled about the cause of his or her injury, where the Court is the trier of fact, the Court must decide whether the plaintiff

---

10. Misinformation about the cause of an injury is distinguishable from the "erroneous or incompetent advice" discussed in *Kubrick.* The *Kubrick* Court held that the statute of limitations is not tolled simply because a plaintiff is erroneously advised that the defendant has not acted negligently. 444 U.S. at 124. The "incompetent advice" discussed in *Kubrick* was advice pertaining to a plaintiff's legal rights and/or the viability of a plaintiff's cause of action. In contrast, the "incompetent advice" referred to in *Chamness* pertains to the cause of a plaintiff's injury. This latter type of advice can toll the statute of limitations. *See Chamness,* 835 F.2d at 1353; *Otto v. National Institute of Health,* 815 F.2d 985, 989 (4th Cir.1987).

has exercised due diligence to uncover the cause of his or her injury. The statute of limitations will not begin to run for a plaintiff until that plaintiff actually discovers, or in the exercise of due diligence should have discovered, the cause of his or her injury.

Having identified the dispositive legal questions implicated by defendant's statute of limitations defense, the Court must turn now to the facts in the cases of the nine plaintiffs named above. However, rather than separately discuss this issue for those nine plaintiffs, the Court will discuss wholly the cases of each of the twelve plaintiffs and incorporate an analysis of the statute of limitations for the appropriate plaintiffs. The Court's discussion will utilize the following format for each plaintiff: (1) the Court will identify what injuries, if any, the plaintiff has suffered; (2) the Court will determine which, if any, of these injuries were proximately caused by the "tampering" which occurred while the plaintiffs were patients at Maxwell Hospital; (3) for those plaintiffs against whom the defendant asserts the statute of limitations defense, the Court will identify when the relevant injury was discovered and when, in the exercise of due diligence, the causal connection should have been discovered; and (4) for any plaintiff who has injuries proximately caused by the defendant's negligence, the Court will discuss damages.

## DISCUSSION

### A. Tiffany Barber

Shortly after her birth, Tiffany "crashed"—her heart rate slowed, she turned blue and the emergency resuscitation team had to be called. She responded well to oxygen and stimulation and experienced no further incidents while at Maxwell Hospital.

When Tiffany was approximately four years old, she was examined by Dr. Colan. Dr. Colan found that Tiffany suffered from dysarthria—an inability to properly pronounce words. Additionally, Dr. Colan noted that Tiffany exhibited explosive aggressive behaviors. Two years later, Tiffany was examined by Dr. Thomas J. Boll, an expert in clinical and neuropsychology and pediatric psychology. Dr. Boll found that Tiffany had some "mild naming difficulties," but otherwise found her speech to be average for her age. Dr. Boll found that Tiffany displayed bilateral incoordination and clumsiness in gross motor skills. Finally, Dr. Boll found that Tiffany had difficulty with complex cognitive processing and memory—suggestive of some neurodevelopmental compromise—but he was not sure whether Tiffany actually had a neurodevelopmental deficit.

A year later, Tiffany was examined at the Sparks Center at the University of Alabama at Birmingham. The Sparks Center employs an "evaluation team," consisting of doctors and experts in a variety of fields, each of whom independently examines a patient. The findings of the various doctors and experts are then synthesized by a "case coordinator" in an effort to provide a comprehensive understanding of a patient's neurological development. The Sparks Center summary for Tiffany indicates that her speech skills were found to be average and she had a "mild delay in gross motor skill most likely related to her mild obesity and joint hyperlaxity." Tiffany's mother reported to the evaluation team that Tiffany displayed emotional and behavioral problems. The Sparks center team concluded that these problems may relate to family stressors and that they needed to be explored through individual and family therapy.

Two years later, Dr. Boll examined Tiffany a second time. In his report following this examination, Dr. Boll summarily stated: "Tiffany has multiple developmental difficulties, including some speech and language delay, aggressiveness, behavioral management problems, difficulty with reading and clumsiness." More specifically, however, Dr. Boll stated that Tiffany's language examination was above average with regard to both receptive and expressive language processing. He also found that Tiffany's motor examination was normal with the exception of left-sided incoordination, slowness and unsteadiness. Notably, when Dr. Boll testified at trial, he stated that he could not actually diagnose Tiffany with any problems; rather, he believed that Tiffany was "at-risk" in the areas of self-help skills, gross motor skills and social maturity.

Tiffany's mother, Delight Barber, has consistently through the course of these exami-

nations reported that Tiffany displayed emotional and behavioral problems. At trial, Mrs. Barber testified that Tiffany was very volatile, quick to anger and easily frustrated. Additionally, Mrs. Barber stated that Tiffany has poor balance and coordination problems, particularly on her left side.

■ After carefully considering the reports and testimony of these doctors, Mrs. Barber and all other relevant evidence, the Court finds that Tiffany has the following "injuries": (1) pain and suffering related to the "crash" Tiffany experienced as an infant; (2) emotional and behavioral difficulties; and (3) mild gross coordination problems.[11] The Court must now determine which, if any, of these injuries were proximately caused by Beckelic's "tampering."

In Dr. Colan's opinion, Tiffany's "crash" was caused by Beckelic injecting her with a toxic dose of lidocaine. Tiffany displayed the "core" lidocaine poisoning symptoms of bradycardia, acidosis, apnea, hyperglycemia and cyanosis. As noted above, while there are many potential causes for any one of these symptoms, Dr. Colan opined, to a reasonable degree of medical certainty, that this combination of symptoms could only be caused by lidocaine poisoning.

Dr. Colan's opinion that Tiffany's "crash" was caused by lidocaine poisoning is consistent with the opinions of Drs. Stigelman and Walsh. Doctors Stigelman and Walsh were employed by the defendant to assist in the initial investigation into the events that occurred at Maxwell Hospital. Both of these doctors concluded that Tiffany's crash had no medically explainable cause and that lidocaine poisoning could explain Tiffany's symptoms.

Dr. Carter Snead, the defendant's expert in pediatric neurology, neuropharmacology and epilepsy, opined that Tiffany's crash may have been caused by an infection. In fact, Dr. Snead testified that all of the plaintiffs' "crashes" may have been caused by some

bacteria or virus that was present in the nursery and OB/Gyn.

Infection, however, was ruled out as a possible cause of the plaintiffs' "crashes" by the defendant's own investigation into the events at Maxwell Hospital. Dr. Stanford Sadick, the Director of Hospital Services at Maxwell, testified in his deposition that initially, bacteria or viral contamination in the nursery was suspected as a cause of the plaintiffs' crashes. However, after investigators' tests for bacteria and viral contaminants came back negative, infection was ruled out as a possible cause of the plaintiffs' crashes.

Moreover, Dr. Snead's theory of causation does not account for all of the symptoms displayed by the plaintiffs. Dr. Colan agrees with Dr. Snead that some of the plaintiffs may have had an infection at the time they were "tampered" with by Beckelic. But, according to Dr. Colan, only lidocaine would explain that combination of symptoms—bradycardia, acidosis, apnea, hyperglycemia and cyanosis—found in Tiffany and a number of the other plaintiffs.

Finally, there is strong circumstantial evidence which cuts against Dr. Snead's theory of causation. First, the plaintiffs' "crashes" all occurred while Beckelic was present in the nursery or OB and the "crashes" ceased once Beckelic was removed from Maxwell Hospital. Second, many of plaintiffs' "crashes" were reported by Beckelic or occurred shortly after Beckelic had some interaction with a particular plaintiff. Finally, if infection or a virus were responsible for the plaintiffs' illnesses one would expect many more "crashes" than were reported—presumably, every baby in the nursery during the outbreak would have been exposed.

For these reasons, the Court does not accept Dr. Snead's theory that Tiffany and the rest of the plaintiffs' crashes were the result of infection or some other medically explainable cause. Instead, the Court finds that Tiffany's "crash" was caused by Beckelic

---

11. Perhaps a better description of Tiffany's and the other plaintiffs' injuries would be a blanket term such as "neurological injury." While the Court believes such a description would be accurate, the Court has attempted to provide some greater level of detail in its findings of injury. In doing so, the Court does not intend to send the message that these plaintiffs' injuries are narrowly defined. Instead, what the Court is describing is the observed manifestations of plaintiffs' general neurologic injuries.

injecting her with a toxic dose of lidocaine. The Court has previously found that Beckelic's actions were the foreseeable result of defendant's negligence—that is, Beckelic's actions were the foreseeable result of defendant's breach of duty to Tiffany and the other plaintiffs. Accordingly, the Court finds that Tiffany's "crash" was proximately caused by the defendant.

Dr. Colan also expressed the opinion, to. a reasonable degree of medical certainty, that Tiffany's behavior and motor problems were caused by the lidocaine poisoning. For the reasons set forth above, the Court finds that Dr. Colan's opinion has sufficient indicia of reliability to be admissible under *Daubert*. Dr. Snead was of the opinion that Tiffany does not have any "injuries," and thus, offered no opinion on the cause of Tiffany's behavior and motor problems. As noted above, the Sparks Center evaluation team concluded that Tiffany's gross motor impairment is probably related to her mild obesity and joint hyperlaxity.

The defendant argues that Tiffany's behavior problem may have been caused by her environment. In support of this contention, the defendant adduced evidence that Tiffany's home-life may have more than an average amount of family stressors.

■ The Court believes, as does Dr. Colan, that behavior is the product of many influences. That fact, however, does not prevent the Court from finding that Tiffany's behavior problems were proximately caused by the lidocaine poisoning. The Court believes Dr. Colan's testimony that lidocaine poisoning can cause this injury. In all likelihood, Tiffany's environment has exacerbated her behavior problems, but the existence of a second influence (stressful environment) does not preclude the causal connection between lidocaine and this injury. Accordingly, the

Court finds that Tiffany's behavior problems were proximately caused by defendant's negligence.[12]

■ Similarly, the Court finds that Tiffany's motor problems were proximately caused by the defendant's negligence. Once again, the Court believes that the causes identified by the Sparks Center, mild obesity and joint hyperlaxity, may contribute to Tiffany's motor problems, but these causes do not exclude lidocaine poisoning as the primary or an additional cause.

Thus, the Court has found that all three of Tiffany's injuries were proximately caused by the defendant. The Court must now decide whether all or part of Tiffany's claim is barred by statute of limitations. As noted above, this inquiry requires the Court to determine two things: (1) when the injury was discovered and (2) when, in the exercise of due diligence, Tiffany's parents should have discovered the causal connection between Tiffany's injury and the Defendant.

Tiffany's mother testified that she knew Tiffany had "crashed" at Maxwell Hospital, but stated that she didn't understand the full circumstances of what happened at the time of the "crash." Several months later in March 1989, Tiffany's parents met with investigators from the OSI. Mrs. Barber testified that she was told an investigation was being conducted into the circumstances surrounding a number of infants who had crashed at Maxwell Hospital and that Tiffany was one of them. According to Mrs. Barber, this is all the information she was given about the circumstances of Tiffany's crash.

■ Mrs. Barber testified that she received no follow-up call from the OSI investigators. The Court finds, however, that in the exercise of due diligence, Tiffany's par-

---

**12.** The Court's finding in this regard is supported by Dr. Boll's trial testimony. Asked what the chances were that a group such as these twelve plaintiffs would display so many of the same disabilities and impairments by mere coincidence, Dr. Boll responded "none." In other words, unless these plaintiffs were assembled **because of** their disabilities and impairments, it is extremely improbable that their disabilities and impairments were caused solely by explainable medical processes and/or environmental influences. Of course, these plaintiffs were not assembled because of their impairments and disabilities; instead, it was their common experience as victims of "tampering" at Maxwell Hospital which brought this group of plaintiffs together. From this testimony, the Court infers that even if environmental or other influences contribute to the "cause" of a particular disability, lidocaine poisoning is probably the primary cause of any of the plaintiffs' injuries which can reliably be attributed to lidocaine poisoning.

ents should have pursued further information about the "investigation." The Court believes that a reasonable person is put on alert that something may be awry when he or she learns that an investigation is being conducted into the circumstances of an injury. Had Tiffany's parents pursued the matter, they would have learned that "foul play" was suspected as the cause of Tiffany's "crash."[13] Accordingly, the Court finds that Tiffany should have known of the causal connection between Tiffany's crash and the defendant's action by March 1989. Tiffany did not file an administrative claim until more than three years later, on July 8, 1992. Therefore, the Court finds that Tiffany cannot recover from the defendant for pain and suffering stemming from her initial "crash" at Maxwell Hospital.

Dr. Colan testified that the chronic symptoms of lidocaine poisoning would take additional time to manifest themselves and become recognizable. Accordingly, the Court finds that Tiffany's motor and behavior problems were neither known nor discoverable at the time Tiffany's parents learned of Tiffany's "crash."[14] Therefore, the statute of limitations did not begin running until Tiffany's parents actually discovered these injuries. *See Burgess,* 744 F.2d at 775. However, it is not clear from the evidence when Tiffany's parents first noticed Tiffany's behavior and motor problems.[15]

It is clear however, that Tiffany's parents did not discover a link between these problems and Beckelic's tampering until they met with Dr. Colan in 1992. Furthermore, the Court finds that Tiffany's parents could not, in the exercise of due diligence, have discovered this link any earlier. Without specific information about the nature of the tampering, Tiffany's parents could not possibly discover a link between these later-developing injuries and the tampering. The Court is unconvinced that an investigation conducted with due diligence by Tiffany's parents would have turned up sufficient information to allow Tiffany's parents to discover this link.[16] Accordingly, the Court finds that Tiffany may recover for the defendant's negligence to the extent that negligence proximately caused Tiffany's behavior and motor problems.

This brings the Court to the question of damages. Because Tiffany has suffered injuries proximately caused by defendant's negligence she is entitled to recover damages. Under the Federal Torts Claims Act ("FTCA"), Tiffany can recover compensatory damages against the defendant to the same extent that she could recover against a private individual under like circumstances. 28 U.S.C. § 2674. Alabama law governs the award of damages. *Edwards v. United States,* 552 F.Supp. 635, 639 (M.D.Ala.1982) (citing *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962) and *Ross v. United States,* 640 F.2d 511, 518–19 (5th Cir.1981)). Under Alabama law, Tiffany and/or her parents may recover the following types of damages: (1) Past and future reasonable and necessary medical expenses including travel expenses attendant thereto, *see, e.g., Smith v. Richardson,* 277 Ala. 389, 171 So.2d 96, 100 (1965) and the value of nursing care rendered by her parents, *see, e.g., Williston v. Ard,* 611 So.2d 274, 281 (Ala.1992); (2) lost earning

13. By March of 1989, Maxwell Hospital's commanding officers and investigators had concluded that many of the crashes occurring at the Hospital had no medically explainable cause and were likely the result of an accidental or intentional act. Furthermore, this information was not kept secret; many of the other plaintiffs' parents were given this information directly and these conclusions were made a part of an Air Force press release.

14. This finding applies to all of the plaintiffs to the extent they have injuries which are the sequelae of lidocaine poisoning.

15. Nevertheless, the Court believes that because the statute of limitations is an affirmative de-

fense, Tiffany does not bear the burden of showing that she discovered these later injuries within two years of the date she filed her administrative claim. Instead, the defendant bears the burden of establishing that Tiffany's parents discovered, or should have discovered, these injuries more than two years before Tiffany filed an administrative claim. *See* discussion of Warrick, *infra* p. 80.

16. While the defendant did explain to a number of the plaintiffs that an investigation was being made into the events at Maxwell Hospital, with the exception of Sharpe, none of the plaintiffs was given any specific information about the nature of the tampering.

capacity if the injuries suffered are permanent and there is a reasonable basis from which to determine lost earning capacity, see, e.g., Town of Elba v. Bullard, 152 Ala. 237, 44 So. 412, 413 (1907); (3) physical and mental pain, suffering and mental anguish including future pain, suffering and mental anguish for permanent injuries, see, e.g., Mordecai v. Cardwell, 270 Ala. 723, 121 So.2d 898, 899–900 (1960); and (4) Tiffany's parents may recover for any loss of household services caused by Tiffany's injuries, see, e.g., Smith, 171 So.2d at 100. For any future damages, the Court must take into consideration inflation and the time-value of money. See, e.g., Jack Cole Co. v. Hays, 281 Ala. 118, 199 So.2d 659, 665 (1967).

▉ Tiffany's parents seek a total of $4,679.77 for past medical expenses. Additionally, they claim $332.40 for travel expenses attendant thereto. Of the $4,679.77 in past medical expenses, $3,500 is for past examinations conducted by Dr. Colan and Dr. Boll. The Defendant contends that Tiffany's parents cannot recover the cost of these examinations because they were, in fact, litigation expenses. The Court, however, finds that these examinations were a part of Tiffany's reasonable and necessary medical care and treatment. The examinations of Dr. Colan and Dr. Boll have been critical to diagnosing Tiffany's impairments and identifying their cause. While it is possible to treat the symptoms of an impairment without knowing precisely what the impairment is or how it was caused, it seems to the Court that such a "band-aid" method of treatment is not a desirable manner in which to proceed. The Court believes that a precise diagnosis and information about the cause of an impairment is necessary to design an effective and properly tailored program of treatment and care. Therefore, the Court finds that Tiffany's parents can recover the cost of the past examinations conducted by Dr. Colan and Dr. Boll.[17] Accordingly, the Court finds that Tiffany's parents are entitled to recover

$5,012.17 from the defendant for past medical expenses.

Unlike past medical expenses, future medical expenses have an inherent degree of uncertainty in them. In addition to disagreements over what care and treatment is reasonably necessary to address an injury, parties frequently disagree over what the bottom line cost will be for any treatment or services to be received. Consequently, any award of damages for future medical expenses cannot be made with mathematical precision.

Here, the plaintiffs and defendants have each produced experts who have testified as to the plaintiffs' reasonable and necessary future medical expenses.[18] Predictably, their opinions differ. The Court has listened carefully to the testimony of these experts and has considered all of the evidence relevant to the issue of future reasonable and necessary medical expenses. Based upon careful consideration of all this evidence, the Court finds that Tiffany is entitled to recover $17,000.00 from the defendant for future medical expenses.

▉ Finally, Tiffany seeks recovery for past and future pain and suffering. The trier of fact determines the amount of damages to be awarded for pain, suffering and mental anguish in light of all the relevant circumstances including, but not limited to, the intensity, severity, character and duration of the pain, suffering and mental anguish. See Brandwein v. Elliston, 268 Ala. 598, 109 So.2d 687 (1959). Here, Tiffany's injuries appear to be permanent. While therapy may make her injuries manageable, therapy cannot reverse the damage to Tiffany's nervous system. Moreover, it is impossible to know whether the problems Tiffany is experiencing will improve or worsen as she moves through adolescence and into adulthood. On the other hand, Tiffany's injuries are less severe than those suffered by many of her co-plaintiffs. In light of these consid-

17. The Court finds that this reasoning applies equally to all plaintiffs seeking to recover the expense of past examinations by Drs. Colan and Boll.

18. These experts are Dr. Randall McDaniel, plaintiffs' expert in rehabilitation and vocational services, Dr. Nancy McDaniel, plaintiffs' expert in special education and special education assessment, and Sharon Reavis, defendant's expert in rehabilitation counseling and life-care planning.

erations, the Court finds that Tiffany is entitled to $50,000 from the defendant for past and future pain, suffering and mental anguish. Thus, in summary, the Court finds that judgment is due to be entered for Tiffany and her parents and against the defendant for the sum of $72,012.17. A judgment in accordance with this opinion will be entered separately.

### B. Camoi Barnes

Three days after his birth, Camoi's temperature dropped and he had an episode of hypoglycemia and tachypnea. After an IV was started, Camoi experienced an abrupt deterioration becoming cyanotic with hyperglycemia and severe metabolic acidosis. Camoi began exhibiting seizure-like activity. Camoi was then transferred from Maxwell Hospital to Baptist Medical Center ("BMC"). Camoi remained at BMC for two weeks. Doctors at BMC opined that Camoi may have suffered a right-sided brain hemorrhage, but Dr. Colan disagreed with this interpretation of the medical evidence.

As part of the follow-up care from BMC, Camoi was seen once at the Monsky Clinic in 1989 and again in 1990. At the clinic, doctors noted that they were concerned about Camoi's small head. Also, during the 1990 visit, Camoi's mother told the doctors she was worried that Camoi was having difficulty with his right hand and his feet.

In October of 1991, Camoi was seen at the Gunter Child Development Center. After examining Camoi, doctors at Gunter expressed concern that Camoi's fine and gross motor skills may have been impaired. The doctors also reported that Camoi had noticeable trouble with his right arm, his running gait and foot. Camoi's mother agreed that these were noticeable problems. A reevaluation at the Monsky clinic a month later confirmed the existence of these impairments. In addition, the Monsky doctors concluded that Camoi needed speech therapy.

Dr. Colan examined Camoi on March 2, 1994. Dr. Colan found that Camoi had a speech impediment and a slow rate of speech development. Dr. Colan diagnosed Camoi as suffering from cerebral palsy ("CP") with right-sided paralysis or hemiparesis.

Dr. Boll examined Camoi on June 9, 1994. Dr. Boll characterized Camoi as "somewhat hyperactive, uncooperative, and inattentive." Dr. Boll's test revealed that Camoi had mild dysnomia and difficulty with productive language. Dr. Boll observed, "obvious right sided motor slowness and marked incoordination and unsteadiness." Camoi's sensory perceptual examination showed "inconsistencies and developmental immaturity that very probably reflects neurodevelopmental deficits." Finally, Dr. Boll found that Camoi's cognitive capabilities were markedly impaired. Camoi displayed deficiencies in higher cognitive processing and with verbal and nonverbal memory processing. Dr. Boll summarized his findings: "Camoi demonstrates memory, language, and learning difficulties, problem solving impairment as well as mild right hemiparesis, all consistent with neurological impairment, in addition to which he demonstrates at least mild attentional difficulties at the current time."

Camoi was seen at the Sparks Center approximately one year later. The Sparks Center summary report indicates that Camoi had right hemiparesis, Attention Deficit Hyperactivity Disorder ("ADHD"), a possible learning disability with reading, acute bilateral otitis media and a mild conductive hearing loss. Sparks Center doctors found that Camoi's speech and cognitive abilities fell within the average range.

Finally, Camoi was seen by Dr. Boll again in 1997. Dr. Boll again noted Camoi's right hemiparesis, sensory-perceptual difficulties, language impairment and memory difficulties. While Dr. Boll noted that Camoi's language examination revealed improvement, he concluded that Camoi "continues to present evidence of neurological impairment, as well as neurodevelopmental inconsistency."

Camoi's mother testified at trial. She stated that while Camoi was performing adequately in school, she was required to work very hard with Camoi to maintain that performance. She also expressed concern that Camoi might regress or fall behind at some point in the future. Finally, Mrs. Barnes testified that Camoi exhibits problems with his right arm (he keeps his arm locked and

his fist balled), is frequently confused and is hyperactive and impulsive.

■ After carefully considering the reports and testimony of these doctors and Mrs. Barnes, and all other relevant evidence, the Court finds that Camoi has the following "injuries": (1) pain and suffering stemming from his "crash" at Maxwell Hospital; (2) cerebral palsy with right-sided hemiparesis and consequent motor impairment; (3) ADHD; (4) cognitive impairment; (5) sensory-perceptual impairment; and (6) language impairment.

Dr. Colan testified that he believes, to a reasonable degree of medical certainty, that Camoi's injuries were caused by lidocaine poisoning. At the time of his crash, Camoi exhibited the pattern of "core symptoms" which Dr. Colan testified can only be attributed to lidocaine poisoning.[19] Dr. Colan's research, training and experience, as well as the strong circumstantial evidence discussed above, led him to conclude that Camoi's permanent and chronic injuries are the sequelae of lidocaine poisoning.

The Court has previously discussed and discredited Dr. Snead's opinion that Camoi's "crash" was the result of infection. Like Tiffany, Dr. Snead does not recognize the majority of Camoi's injuries and, therefore, does not offer an opinion as to their cause.[20] Dr. Snead does, however, have an opinion as to the cause of Camoi's cerebral palsy and right-sided hemiparesis. Based upon his review of a recent MRI performed on Camoi, Dr. Snead opined, to a reasonable degree of medical certainty, that Camoi suffered a left thalmic infarct or stroke which caused Camoi's CP and hemiparesis. Dr. Snead went on to state that lidocaine toxicity could not cause the stroke.

Dr. Colan also reviewed Camoi's MRI and agrees with Dr. Snead that there is some evidence that Camoi suffered a left-sided stroke. However, Dr. Colan disagrees with Dr. Snead over whether the stroke could

have been caused by lidocaine poisoning. Dr. Colan believes that a stroke is consistent with the effects of lidocaine poisoning. Dr. Colan explained that the damage to Camoi's brain resulted from a disruption in the flow of blood to his brain which, in turn, was caused by lidocaine poisoning.

The Court accepts Dr. Colan's explanation of the MRI findings. As the Court noted earlier, the Court is convinced that Dr. Colan's theory on, and explanation of, the effects of lidocaine poisoning on neonates is based upon a reasonable extrapolation from reliable scientific research and literature. Accordingly, the Court believes Dr. Colan's testimony that lidocaine poisoning can cause a disruption in the flow of blood to the brain and that this disruption caused Camoi's stroke. Consequently, the Court finds that all of Camoi's injuries were proximately caused by the defendant's negligence.

The defendant asserts that Camoi's claims are barred by the statute of limitations. Camoi's mother testified that in January 1989, she met with agents from the OSI. Mrs. Barnes testified that in this meeting she was told that someone had been injecting or using dirty instruments on babies at Maxwell Hospital. Based upon this testimony the Court finds that by January 1989, Camoi's parents knew that he had been injured in that he had "crashed" and that the injury may have been caused by an act of the defendant. Therefore, because Camoi did not file an administrative claim until March 30, 1993, the Court finds that statute of limitations bars Camoi's claim for recovery for the "crash" suffered at Maxwell Hospital.

It appears that Camoi's parents discovered the first signs of his hemiparesis by the time he was evaluated at the Monsky clinic in 1990. Apparently, however, it was too premature for any doctor to specifically diagnose Camoi as suffering from CP and right-sided hemiparesis, because no diagnosis was made.

---

**19.** Although Dr. Stigelman did not believe Camoi's "crash" was consistent with the surreptitious administration of some exogenous agent, he did not offer an alternative explanation for Camoi's "crash."

**20.** While Dr. Snead does not offer an explanation for these injuries, he does attack Dr. Colan's as

being unsupported by the scientific literature. The Court considered Dr. Snead's criticism of Dr. Colan's reasoning and methodology when determining whether Dr. Colan's opinion bore sufficient indicia of reliability to be admissible. Simply stated, the Court does not agree with Dr. Snead.

There is no evidence which indicates that Camoi's parents discovered his other injuries prior to Camoi's examinations by Drs. Colan and Boll and, as noted earlier, no reason to believe these other injuries were discoverable at any earlier point.

Even if the Court assumes that Camoi's parents should have discovered Camoi's CP and hemiparesis in 1990, his claims would not be barred by the statute of limitations because (1) he did not know, nor could he have discovered in the exercise of due diligence, the existence of a causal link between these injuries and an act of the defendant and (2) the defendant actively misled Camoi's parents as to the cause of his injuries.

■ Mrs. Barnes testified that in her meeting with the OSI agents she was told that, despite the investigation, everything would be "OK" with Camoi. Furthermore, Mrs. Barnes testified that she did not learn that the tampering which occurred at Maxwell Hospital could permanently affect Camoi's health until she met with Drs. Colan and Boll. The Court believes that Mrs. Barnes could reasonably rely on assurances from the defendant that the effects of the suspected tampering, if any, were limited to the "crash" Camoi suffered at Maxwell Hospital. Because the defendant actively misled Mrs. Barnes as to the cause of Camoi's injuries, the Court finds that the statute of limitations was tolled. *See Chamness*, 835 F.2d at 1353.

Thus, the Court has found that Camoi suffered multiple injuries proximately caused by the defendant's negligence and that the statute of limitations only prevents Camoi from recovering damages for the "crash" he suffered at Maxwell Hospital. The Court turns now to the issue of damages.

Camoi's parents seek $4,064.95 in compensation for past medical expenses and travel costs attendant thereto. The Court finds that these costs were incurred for reasonable and necessary medical treatment, and therefore, Camoi's parents are entitled to recover

this sum from the defendant. Once again, plaintiffs' and defendant's experts differ as to the future therapies, treatments and services reasonably necessary to address Camoi's injuries. Based upon careful consideration of all the evidence relevant to the issue of reasonable and necessary future medical expenses, the Court finds that Camoi is entitled to recover the sum of $211,500.00 for future medical treatment, services and therapy.

Camoi seeks to recover for lost earning capacity. Camoi has established that his injuries are permanent and, therefore, he is entitled to recover for lost earning capacity if he provides the Court with a reasonable basis from which to make such a determination. Plaintiffs' expert, Dr. Randall McDaniel, has offered testimony concerning Camoi's lost earning capacity. The Court finds that Dr. McDaniel's testimony is credible and establishes that Camoi's earning capacity will be diminished. Dr. McDaniel furnished his conclusions to Dr. Hebert, plaintiffs' expert in economics. Based on Dr. McDaniel's opinion regarding Camoi's diminished earning capacity, Dr. Hebert calculated the present economic value of Camoi's lost earning capacity. The Court finds that Dr. McDaniel and Dr. Hebert's testimony provides the Court with a reasonable basis from which to award damages for lost earning capacity [21] and accordingly, finds that Camoi is entitled the sum of $742,366.00 from the defendant to compensate him for this loss.

Next, Camoi's parents seek to recover $6,178.00 for the loss of household services caused by Camoi's injuries. Dr. McDaniel opined that Camoi's injuries will reduce his ability to contribute household services. Based on this opinion, Dr. Hebert calculated a present day dollar value for the loss of those services. The Court finds the testimony of Drs. McDaniel and Hebert credible and on the basis of their testimony, the Court finds that Camoi's parents are entitled to recover $6,178.00 from the defendant.

---

**21.** On cross-examination, the defendant elicited the fact that Dr. Hebert had to make a number of assumptions to calculate the present value of Camoi's lost earning capacity. In response, Dr. Hebert testified that he believed all of the assumptions he made were reasonable and gener-

ally accepted within the field of economics. In light of this testimony, the Court finds that Dr. Hebert's conclusions provide the Court with a reasonable basis from which to award Camoi damages for lost earnings capacity.

■ Finally, Camoi seeks recovery for past and future pain, suffering and mental anguish. Camoi's injuries are substantial. Cerebral palsy is a very serious disability with potentially devastating effects. Physically, Camoi will never be able to function like his peers. Although Camoi is currently doing well in school, plaintiffs' experts have testified that maintaining this level of achievement will become increasingly difficult. Also, should Camoi's ADHD grow more severe, even the simplest tasks will become challenging. In light of these considerations, the Court finds that Camoi is entitled to recover $5,000,000 from the defendant for past and future pain, suffering and mental anguish. Thus, in summary, the Court finds that judgment is due to be entered in favor of Camoi and his parents and against the defendant for the sum of $5,964,108.95. A judgment in accordance with this opinion will be entered separately.

### C. Jennifer DeHaai

Only hours after her birth and shortly after a routine check by Beckelic, Jennifer began coughing and choking, became cyanotic, had an elevated respiratory rate and her heart started racing (tachycardia). Tests later revealed that she was hyperglycemic. Jennifer was placed on a heart monitor but no further acute life threatening events occurred at Maxwell Hospital.

Dr. Colan examined Jennifer in September 1992. At this examination Jennifer's mother reported that Jennifer was inattentive, aggressive and overactive. Dr. Colan was also informed that Jennifer had a history of gastrointestinal problems and ear infections. Dr. Colan did not identify any other injuries to Jennifer.

Dr. Boll examined Jennifer in June 1994. Again, Mrs. DeHaai reported that Jennifer displayed difficulty with attention and concentration. Dr. Boll found that Jennifer had some language impairment, dysnomia and reduced expressive language processing. Jennifer's cognitive functioning was inconsistent, but Dr. Boll felt that the inconsistency could be entirely developmental. Finally, Dr. Boll believed that Jennifer may have had either a neurocognitive developmental delay or deficit and that further monitoring was warranted.

The Sparks Center evaluation team saw Jennifer in October 1995. The summary conclusions of the Sparks Team were that Jennifer's cognitive functioning was normal, and that she showed no evidence of a learning disability or attentional problem. Like Dr. Boll, the Sparks Center team found that Jennifer had some language impairment, specifically an expressive language deficit. The Sparks team also expressed concern about Jennifer's flat and possibly depressed emotional state.

Dr. Boll saw Jennifer for the second time on June 4, 1997. Jennifer's parents told Dr. Boll that Jennifer was moody and aggressive with attentional difficulties. On the basis of his examination, Dr. Boll found that Jennifer had some right-sided gross motor difficulties, significant tactile memory perceptual difficulties and some inefficiency in learning. Notably, however, Dr. Boll did not find any language impairment or significant structural impairment in the cognitive process. Dr. Boll opined that Jennifer could possibly have a learning difficulty related to mathematics.

At trial, Dr. Boll stated that Jennifer's expressive language difficulties had improved. He also testified that he believed Jennifer could "grow out of" her right-sided motor difficulties. Mrs. DeHaai also testified during the trial. She stated that Jennifer's gastrointestinal problems and ear infections, which arose shortly after Jennifer's birth, stopped at around the age of three. Mrs. DeHaai testified that she didn't believe Jennifer had attention problems. According to Mrs. DeHaai, Jennifer's primary on-going difficulties relate to inappropriate behavior, mood swings and anger.

After carefully considering the reports and testimony of these doctors, Mrs. DeHaai and all other relevant evidence, the Court finds that Jennifer has the following "injuries": (1) pain and suffering related to the crash at Hospital; (2) gastrointestinal problems which persisted until the age of three; (3) ear infections which persisted until the age of three; (4) emotional and behavioral problems; and (5) an improving language disorder.

■ Although Jennifer's initial symptoms differed somewhat from the "core" symp-

toms Dr. Colan has identified as indicative of lidocaine poisoning, Dr. Colan testified that Jennifer's tachycardia (as opposed to bradycardia) and elevated respiratory rate (as opposed to apnea) were consistent with the initial stages of lidocaine poisoning. Dr. Colan maintains to a reasonable degree of medical certainty that Jennifer's "crash" was the result of lidocaine poisoning. In this regard, Dr. Colan's testimony is consistent with the testimony of Drs. Walsh and Stigelman.

■ As discussed earlier, Dr. Colan has identified language impairments and emotional and behavioral problems as sequelae of lidocaine poisoning. Dr. Colan testified that he could not link Jennifer's ear infections to lidocaine poisoning. Accordingly, the Court finds that Jennifer's language impairment and emotional and behavioral problems were caused by defendant's negligence, but that Jennifer's ear infections were not caused by defendant's negligence.

■ Dr. Colan stated that he could not identify a scientific "mechanism" by which lidocaine poisoning would cause Jennifer's gastrointestinal problems. Nevertheless, Dr. Colan testified that he did believe that lidocaine poisoning could cause gastrointestinal dysfunction. Dr. Colan explained that the incident rate of gastrointestinal problems in the group of Maxwell Hospital patients he suspects were tampered with represents a tenfold increase over what one would expect to find in the pediatric population by chance alone. Dr. Colan concluded that based on the abnormally high rate of gastrointestinal problems in the plaintiffs as a group, "it is highly unlikely from a scientific standpoint that these are random events and likely represent heretofore undiscovered effect of Lidocaine introduction at this fragile developmental stage." Colan Dep. of 3/3/94 at 155.

The Court, applying ordinary common-sense to the facts as developed by the evidence, also believes that lidocaine poisoning can cause gastrointestinal difficulties. The Court believes it is reasonable to infer that lidocaine poisoning can cause gastrointestinal impairment from the fact that so many of the plaintiffs, people whose only common experience in life is the fact that they were poi-

soned with lidocaine, experienced this problem.[22] Moreover, the defendant did not offer any alternative explanation as to why so many of the plaintiffs suffer from gastrointestinal problems. Thus, given that the standard of proof is merely a preponderance—that is, the plaintiffs must only prove that it is more likely than not—the Court finds that Jennifer's gastrointestinal problems were caused by lidocaine poisoning and, thus, proximately caused by the defendant's negligence.

The defendant does not contend that Jennifer's claims are barred by the statute of limitations. Therefore, the Court turns directly to the issue of damages.

Jennifer's parents seek $5,937.90 for past medical expenses, value of attendant care and travel expenses. The Court finds that this amount was reasonable and necessary and that Jennifer's parents are entitled to recover the same from the defendant. Once again, the plaintiffs' and defendant's experts disagree over what future medical services, treatments and therapies will be reasonably necessary to address Jennifer's injuries. Based upon careful consideration of all the evidence relevant to the issue of reasonable and necessary future medical expenses the Court finds that Jennifer is entitled to recover the sum of $18,500.

Finally, Jennifer seeks to recover for the pain, suffering and mental anguish she has and will continue to endure. Unlike Camoi and Tiffany, Jennifer is entitled to recover for the pain and suffering occasioned by the initial "crash" at Maxwell Hospital. Although Jennifer's gastrointestinal problems have apparently abated, she appears to have suffered greatly because of them. While Jennifer's expressive language is improving, Jennifer continues to have difficulty with emotional and behavioral problems. It is unclear whether these latter problems will worsen or improve with time. In light of these considerations, the Court finds that Jennifer is entitled to recover $200,000 from the defendant for past and future pain, suffering and mental anguish. Thus, in summary, the Court finds that judgment is due

---

**22.** To make this inference, the Court only considered the experiences of those plaintiffs and other Maxwell patients who Dr. Colan found to have been poisoned with lidocaine.

to be entered in favor of Jennifer and her parents and against the defendant for the sum of $224,437.90. A judgment in accordance with this opinion will be entered separately.

### D. Corey Fowler

██ The "tampering" Corey was subjected to at Maxwell Hospital differed from that suffered by the other plaintiffs. Corey was found by a nurse essentially choking on his own blood. An examination revealed that he had a deep laceration of the upper palate. The next day Corey was again found to have blood coming from his nose and mouth. Shortly thereafter, he was transferred to BMC.

Although Dr. Colan hypothesized that Corey's lacerated palate may have been the result of an attempt to inject him with lidocaine through the roof of his mouth, Corey did not exhibit the pattern of core symptoms which Dr. Colan has identified as the lidocaine poisoning footprint. Dr. Colan opined that while Corey displayed some symptoms consistent with lidocaine intoxication (irritability) he could not conclude that the events that occurred to Corey were clearly or definitely related to the presence of lidocaine. Dr. Colan stated, "I do not see any conclusive evidence to suggest that there was something wrong with him other than the reaction and irritability to having a mouth and throat full of blood ... I couldn't find anything on Fowler that would suggest that he had to have been injected with anything, although he was harmed in another way." Like Dr. Colan, Dr. Stigelman did not believe that Corey's initial incident was related to lidocaine poisoning.

The Court addresses this causation evidence somewhat "out of turn," because it renders a further discussion of Corey's injuries moot. That is, based on the evidence in the record, the Court cannot find that Corey was poisoned with lidocaine. Consequently, the Court has no basis to link Corey's later developing injuries to the tampering which occurred at Maxwell Hospital. Accordingly, the Court finds that, with the exception of the initial incident at Maxwell Hospital, Corey has failed to establish that his injuries were proximately caused by the defendant.

██ The evidence does demonstrate that Corey's injuries at Maxwell Hospital were proximately caused by defendant's negligence. Dr. Colan testified that the type of laceration Corey suffered could not occur spontaneously or that the injury was incidental or accidental. The Air Force appears to have agreed with this conclusion as an officer from Maxwell Hospital called the Fowlers to say that they believed Corey's injuries were the result of deliberate criminal acts.

██ Unfortunately for Corey however, he cannot recover from the defendant for the injuries he sustained at Maxwell Hospital because his claim is barred by the statute of limitations. Obviously, Corey's parents learned of his initial injuries at Maxwell Hospital at the time or shortly after they occurred. Mrs. Fowler's trial testimony reveals that she was aware, or should have been aware, of a causal link between Corey's lacerated palate and acts of the defendant no later than February 1989. Mrs. Fowler testified that in February 1989, she spoke to a Colonel at Maxwell Hospital and was informed that Corey's incident was under investigation. The Court finds that by this date Corey's parents had enough information to suspect a link between Corey's lacerated palate and acts of the defendant. Therefore, because Corey did not file an FTCA administrative claim until March 30, 1993, the Court finds that Corey's claims are barred by the statute of limitations. Accordingly, the Court finds that Corey's claims are due to be dismissed.

### E. Melanie Gess

About ten hours after birth Melanie abruptly "crashed." Melanie was found pale and not breathing. Emergency resuscitation efforts were started, she was given CPR, stimulation and then mouth to mouth resuscitation. Finally, she had to have an endotracheal tube put into her lungs to assist her breathing. A few hours later, Melanie was transferred to BMC. At the time of her "crash," Melanie displayed the familiar core pattern of symptoms indicative of lidocaine poisoning: bradycardia, acidosis, apnea, hyperglycemia and cyanosis.

Melanie was first seen by Dr. Colan in 1992. Dr. Colan found that Melanie's speech was impaired. Additionally, Dr. Colan noted a history of chronic difficult constipation. Finally, Dr. Colan noted that through her first year of life, Melanie had adhesive vaginitis.

Dr. Boll examined Melanie in June 1994. Melanie's parents reported that she had been bothered by gastrointestinal difficulties since birth. Dr. Boll's examination revealed that Melanie had significant difficulties with articulation immaturity and speech. Dr. Boll also found that Melanie had "at least mild, and especially left sided fine and gross motor incoordination, bilateral sensory perceptual difficulties, and mild memory and problem solving inefficiencies."

The Sparks Center evaluation team saw Melanie approximately a year later. The Sparks Center team found that Melanie had articulation difficulties, but not a speech disorder. Melanie's cognitive abilities were found to be average and no learning disabilities were diagnosed. The team found that Melanie did not display any attentional impairment nor did she demonstrate any motor impairment. Finally, it was noted that Melanie had suffered gastrointestinal problems from infancy and that they had not responded well to treatment.

Dr. Boll saw Melanie a second time on June 13, 1997. Dr. Boll's tests revealed that Melanie continued to demonstrate moderate bilateral tactile difficulties. These difficulties correlate with long term impairment of the central nervous system and long term difficulties in academic achievement. Dr. Boll noted that some of the information Melanie's family provided suggested that Melanie might have an attention disorder, but he did not diagnose Melanie as suffering from Attention Deficit Hyperactivity Disorder. No speech articulation problems were observed. Once again, Dr. Boll noted Melanie's significant gastrointestinal difficulties.

 After carefully considering the testimony and reports of these doctors and all other relevant evidence, the Court finds that Melanie's relevant injuries are: (1) pain and suffering stemming from the tampering which occurred at Maxwell Hospital; (2) severe gastrointestinal difficulties; (3) an artic-

ulation impairment; and (4) sensory perceptual impairment.

As noted above, Melanie displayed the core pattern of symptoms which Dr. Colan has identified as indicative of lidocaine poisoning. On this basis, Dr. Colan testified that he believed, to a reasonable degree of medical certainty that Melanie's crash was caused by lidocaine poisoning. This testimony is consistent with the testimony of Dr. Walsh. Also as discussed earlier, Dr. Colan has opined that lidocaine poisoning can cause speech impairments. Dr. Boll testified that Melanie's sensory perceptual difficulties correlate with long-term impairment of the central nervous system and Dr. Colan has testified that lidocaine poisoning causes central nervous system impairment. Finally, the Court has previously concluded that it is more likely than not that lidocaine poisoning causes gastrointestinal injury. Accordingly, the Court finds that all of Melanie's injuries were proximately caused by the defendant.

In its Memorandum Opinion and Order of October 2, 1995, the Court denied defendant's motion to dismiss Melanie's claims as time barred. The Court found that the defendant had actively misled Melanie as to the cause of her subsequent injuries and, therefore, the statute of limitations was tolled. *Gess v. United States,* 909 F.Supp. 1426, 1439 (M.D.Ala.1995). The defendant has presented no evidence which casts doubt on the Court's previous finding that the defendant actively misled Melanie's parents about the cause of Melanie's subsequent injuries. Accordingly, the Court finds that the statute of limitations does not prevent Melanie from recovering for all of her injuries discovered subsequent to the initial "tampering" incident at Maxwell Hospital. The Court does, however, find that Melanie's parents knew that Melanie had "crashed" at Maxwell Hospital and that the "crash" may have been caused by an act of the defendant more than two years prior to the date Melanie filed her FTCA administrative claim. Accordingly, the Court finds that Melanie cannot recover from the defendant any damages pertaining to the initial "crash" suffered at Maxwell Hospital.

Melanie's parents seek to recover $6,742.00 from the defendant for past medical expenses, travel expenses appurtenant thereto and the value of attendant care. Based on the evidence presented, the Court finds that Melanie's parents are entitled to recover the sum of $6,611.00 to compensate them for Melanie's past reasonable and necessary medical, travel and attendant care expenses.[23] Once again, plaintiffs' and defendant's experts disagree as to what future medical services, treatments and therapies are reasonably necessary to address Melanie's injuries. Based upon careful consideration of all the evidence relevant to the issue of reasonable and necessary future medical expenses the Court finds that Melanie is entitled to recover the sum of $106,850.00 from the defendant.

The Court finds that Melanie has established that the defendant has caused her permanent neurological injury. Furthermore, the Court finds that Melanie has provided the Court with a reasonable basis from which to make an award of damages for lost earning capacity. Based upon the opinion of Dr. Randall McDaniel and the economic calculations of Dr. Hebert, the Court finds that Melanie is entitled to recover $174,822.00 for lost earning capacity.

Finally, Melanie seeks to recover for the pain, suffering and mental anguish she has, and will continue to suffer. Melanie's most serious problem appears to be her gastrointestinal problems. Melanie has obviously suffered greatly from this impairment and, as yet, there is no indication that treatment will cure or reduce the severity of her gastrointestinal troubles. Melanie appears to have overcome, or is coping well with, her speech impairment. According to Dr. Boll, Melanie's continuing sensory perceptual problem is a portent of further difficulties down the road. While Melanie is currently doing well academically, the evidence suggests that she will encounter increasing difficulty in the years ahead. In light of these considerations, the Court finds that Melanie is entitled to recover $1,000,000 from the defendant for past and future pain, suffering and mental anguish. Thus, in summary, the Court finds that judgment is due to be entered in favor of Melanie and her parents and against the defendant for the sum of $1,288,283.00. A judgment in accordance with this opinion will·be entered separately.

### F. Tonyanika Givens

Just hours after she was born, Beckelic "found" Tonyanika choking and he removed blood and mucus from her airway. Beckelic cleared Tonyanika's airway a second time approximately twenty-four hours later. Shortly thereafter, Tonyanika began gasping and became limp and cyanotic. Tests were run and she was found to be hyperglycemic. A spinal tap was done and an IV started. About two hours later, Tonyanika suddenly collapsed, her heart virtually stopped, her skin was gray and spotty and she was severely acidotic. An endotracheal tube was inserted into her throat and medicine was administered to counteract her acid buildup. Tonyanika was then transferred to BMC where she remained extremely jittery for some time.

Dr. Colan examined Tonyanika in September 1992. Dr. Colan noted that Tonyanika had a history of abdominal and groin pain. His examination of Tonyanika revealed that she had cerebral palsy and paralysis, dystonia and spasticity of the right arm.

Dr. Boll examined Tonyanika approximately two years later. It was reported that Tonyanika had a history of seizures. Dr. Boll found that Tonyanika had mild right hemiparesis and some sensory perceptual difficulties associated with the hemiparesis. Finally, Dr. Boll found the possibility of mild language lag or dysnomia which needed follow-up.

The Sparks Center evaluation team saw Tonyanika in July 1995. Although the evaluation team observed weakness in her right arm and hand and a corresponding impact in her gross and fine motor skills, the team thought that these injuries might be attributable to a peripheral nervous system problem rather than a central nervous system deficit. While the team felt it did not have enough

---

**23.** The Court cannot determine whether expenses of $97.00 for a "walker per Mrs. Barbara Gess's report" and 34.04 for drugs purchased in 1988 are reasonable and necessary medical expenses.

information to diagnose Tonyanika with ADHD, it did observe behaviors indicative of this disorder. The Sparks team found that Tonyanika's language skills were average and her overall cognitive ability was in the low average range.

Tonyanika made her second visit to Dr. Boll on June 12, 1997. Dr. Boll observed that Tonyanika continued to display mild right-sided hemiparesis, slowness and incoordination and that this impairment made it difficult for Tonyanika to complete complex motor tasks. Of concern to Dr. Boll was his finding that Tonyanika's cognitive development had experienced decline. Dr. Boll measured Tonyanika's verbal IQ as average, her performance IQ as low average to mild mental deficiency and her full scale IQ as borderline mental deficiency. However, Dr. Boll stated that Tonyanika's language functioning appeared average. Finally, Dr. Boll found that Tonyanika continued to display some sensory perceptual impairment.

At trial, Dr. Boll testified that Tonyanika's paralysis appeared to reflect a central nervous system disorder, but that he would defer to the diagnosis of others with greater training and skill in that area. He also stressed the significance of Tonyanika's falling IQ scores. Dr. Boll felt strongly that this trend indicated that Tonyanika's academic performance would suffer in the future.

■ After carefully considering the testimony and reports of these various doctors and all other relevant evidence, the Court finds that Tonyanika has the following relevant injuries: (1) significant pain and suffering related to the tampering incidents at Maxwell Hospital; (2) monoparesis, dystonia and spasticity of the right arm; (3) gastrointestinal problems which have apparently now abated; (4) seizures; and (5) generalized neurological impairment manifested in sensory perceptual difficulties and falling IQ scores.

Dr. Colan testified to a reasonable degree of medical certainty that Tonyanika was the victim of multiple exposures to lidocaine. In Dr. Colan's opinion, Tonyanika received one dose orally or nasogastrally and then a second, potentially lethal dose through her IV. Once again, Dr. Colan's opinion is supported

by the presence of the lidocaine poisoning footprint: bradycardia, acidosis, apnea, hyperglycemia and cyanosis. Dr. Colan's opinion regarding Tonyanika's crash is consistent with the testimony of Drs. Walsh and Stigelman.

In response, the defendant again asserts its infection theory. Dr. Snead's opinion in this regard is corroborated by defendant's expert in neonatology and clinical pharmacology, Dr. Robert Roberts. Defendant points to evidence that Tonyanika's mother had a cold at the time Tonyanika was born and that Tonyanika's temperature was abnormal. Dr. Roberts and Dr. Snead both identified a number of indicators of infection in Tonyanika. Dr. Roberts testified to a reasonable degree of medical certainty that Tonyanika's clinical picture could be explained by infection, and that he had no reason to suspect lidocaine poisoning.

The Court is not persuaded by the defendant's explanation. The defendant has not adequately explained the presence of symptoms displayed by Tonyanika and other plaintiffs not readily attributable to infection. In contrast, Dr. Colan has stated that, while many of the plaintiffs may very well have been suffering from infection, most plaintiffs display a core pattern of symptoms which can only be caused by lidocaine poisoning. Thus, while it is possible that infection contributed to or exacerbated Tonyanika and the other plaintiffs' initial injuries, from the Court's review of the evidence it appears more likely than not that Tonyanika's initial injury was caused by lidocaine poisoning.

As previously discussed, Dr. Colan has testified to a reasonable degree of medical certainty that lidocaine poisoning can cause neurological impairment which manifests itself in a variety of ways including hemiparesis, sensory deficiencies and learning problems. The defendant's experts suggested that Tonyanika's right-arm difficulties may possibly be related to an IV injury she suffered as a neonate and/or that the injury stemmed from peripheral nervous system damage rather than a central nervous system deficit. Weighing the speculative testimony of the defendant's experts against the testimony of Dr. Colan, the Court finds it more likely than

not that Tonyanika's hemiparesis and neurological impairment were caused by lidocaine poisoning.

All doctors appear to be in agreement that lidocaine poisoning can cause seizures and the Court has previously found that lidocaine poisoning can cause gastrointestinal injury. Accordingly the Court finds that all of Tonyanika's injuries were proximately caused by the defendant's negligence.

The defendant does not contend that Tonyanika's claims are barred by the statute of limitations. Therefore, the Court will turn directly to the issue of damages.

Tonyanika's parents seek to recover $3,657.54 for past medical expenses. The Court finds that this sum represents the cost of reasonable and necessary medical treatment, and that Tonyanika's parents are entitled to recover the same. Predictably, plaintiffs' and defendant's experts disagree over what future medical treatment, care and services are reasonably necessary to address Tonyanika's injuries. Based upon careful consideration of all the evidence relevant to the issue of reasonable and necessary future medical expenses the Court finds that Tonyanika is entitled to recover the sum of $245,000.00 from the defendant.

The Court finds that Tonyanika has established that the defendant has caused her permanent neurological injury. Furthermore, the Court finds that Tonyanika has provided the Court with a reasonable basis from which to make an award of damages for lost earning capacity. Based upon the opinion of Dr. Randall McDaniel and the economic calculations of Dr. Hebert, the Court finds that Tonyanika is entitled to recover $345,415.00 for lost earning capacity.

Next, Tonyanika's parents seek to recover $18,292.00 for the loss of household services caused by Tonyanika's injuries. Tonyanika's parents rely on the opinions of Dr. McDaniel regarding Tonyanika's ability to contribute to household services and Dr. Hebert's economic calculation to arrive at this sum. On the basis of Dr. McDaniel's and Dr. Hebert's testimony, the Court finds that Tonyanika's parents are entitled to recover $18,292.00 from the defendant for lost household services.

Finally, Tonyanika seeks to recover for the pain, suffering and mental anguish she has, and will continue to suffer. Tonyanika is entitled to recover for the pain and suffering she was put through as a result of the initial tampering at Maxwell Hospital. This initial near-death experience was clearly extremely traumatic. Although no longer an issue, Tonyanika suffered gastrointestinal pain for some period of time. Tonyanika's motor problems are permanent. She will never have full use of her right hand and arm. Finally, Tonyanika's neurodevelopmental picture is growing cloudy. Dr. Boll testified that he is quite certain that for Tonyanika, the road ahead will grow increasingly difficult. In light of these considerations, the Court finds that Tonyanika is entitled to recover $3,500,000.00 from the defendant for past and future pain, suffering and mental anguish. Thus, in summary, the Court finds that judgment is due to be entered in favor of Tonyanika and her parents and against the defendant for the sum of $4,112,364.54. A judgment in accordance with this opinion will be entered separately.

### G. Aaron Goggans

Because the circumstances of Aaron's injuries differ significantly from the rest of the plaintiffs, the Court's discussion will not follow the format used above.

Aaron did not display any signs of injury until shortly after he was circumcised. After the circumcision, there was an unusual and persistent swelling of the scrotum and testicles and a bruise at the base of his penis. Dr. Colan testified that these symptoms were not normal sequelae of circumcision. Dr. Colan concluded, to a reasonable degree of medical certainty, that Aaron's initial symptoms were the result of tampering.

The defendant responds that Beckelic could not have tampered with Aaron because he had been removed from duty at Maxwell Hospital. A number of Beckelic's coworkers and his immediate supervisor testified to the effect that they were told Beckelic was not allowed in the Maxwell Hospital nursery and that they did not see Beckelic at any time in the ward. Further, the defendant points out that, unlike the other plaintiffs in this litiga-

tion, Beckelic's name appeared nowhere in Aaron's medical records—there is no documented record that Beckelic ever interacted with Aaron.

In response to the defendant's contention, Aaron's grandmother, Rebecca Goggans testified that she personally saw Beckelic on three occasions in Maxwell Hospital. Significantly, Mrs. Goggans stated that it was Beckelic who brought Aaron into his mother's hospital room after the circumcision. Mrs. Goggans states that she is absolutely certain that it was Beckelic because he had on a name tag. The Court observed no signs of deception in Mrs. Goggans during her testimony.

The Court believes that Beckelic was told by his superior that he was not permitted in Maxwell Hospital. Further, the Court believes that he was not present, or at least was not seen, during his regular shift, with his regular coworkers and supervisor. Beckelic, however, is clearly a sick individual. The Court believes that Beckelic entered Maxwell Hospital either surreptitiously or at a time when those in charge were not aware he had been banned.[24] The Court finds that Mrs. Goggans was telling the truth when she testified that she saw Beckelic bring Aaron into his mother's room after his circumcision. Therefore, on the basis of Dr. Golan and Mrs. Goggans' testimony, the Court finds that the swelling of Aaron's scrotum and testicles and the bruise at the base of his penis were proximately caused by Beckelic's tampering and defendant's negligence.

█ Aaron has a host of other injuries. Aaron's other injuries are both permanent and of the most severe nature. Unfortunately for Aaron, however, there is simply insufficient evidence for the Court to conclude it more likely than not that these other injuries were caused by defendant's negligence. Dr. Colan has testified that Aaron definitely was not the victim of lidocaine poisoning. And, while Dr. Colan suggested that Aaron may have been injected with some heavy metal, he did not hold this opinion to a reasonable degree of medical certainty. Furthermore,

Dr. Colan did not identify any specific heavy metal that could cause the injuries Aaron suffers from. Finally, defendant has produced evidence that Aaron's injuries may be the product of a mitochondrial disorder. While Aaron has produced evidence in response to defendant's contention, he has failed to affirmatively show a link between his injuries and the defendant's negligence. Accordingly, the Court finds that only Aaron's swollen scrotum and testicles and the bruise at the base of Aaron's penis were proximately caused by defendant's negligence.

Because the defendant does not assert that Aaron's claims are barred by the statute of limitations, the Court turns directly to the question of damages. Limited to the one injury discussed above, Aaron's damages are relatively minor. The Court cannot find evidence of any past or future medical expenses stemming from this one injury. The only damages which the Court finds Aaron is entitled to recover are for pain, suffering and mental anguish. Aaron's mother, Connie Mullen, testified that, to this day, Aaron continues to frequently complain of pain in his penis area. Although the Court is uncertain of the severity of the pain Aaron experiences, it appears to the Court that he may continue to suffer from this pain indefinitely. Furthermore, it is presently unknown whether Aaron's injury may later develop complications such as a negative impact on his reproductive capability. In light of these considerations, the Court finds that Aaron is entitled to recover $75,000.00 from the defendant for past and future pain, suffering and mental anguish. Thus, in summary, the Court finds that judgment is due to be entered in favor of Aaron and against the defendant for the sum of $75,000.00. A judgment in accordance with this opinion will be entered separately.

### H. Emily Roberts

Emily was doing well until about twelve hours after her birth when she became con-

---

24. The defendant argues that Mrs. Goggans' testimony is not credible because she did not visit Maxwell Hospital during Beckelic's normally scheduled hours—the night shift. However, it is the Court's belief that Beckelic was not in the Hospital during his regularly scheduled hours, but was instead "sneaking around" during hours when he was less likely to be recognized and/or caught and disciplined. Mrs. Goggans' testimony is consistent with the Court's belief.

gested. A little while later, Beckelic "found" Emily suffering from a decreased heart rate and an increased respiratory rate. Emily appeared cyanotic. Beckelic was with Emily when she suffered a second episode later that night. Again she became cyanotic, and this time apneic—she stopped breathing. Beckelic stimulated her and she responded well.

Dr. Colan examined Emily in September 1992. His examination revealed that her speech was impaired in that she stuttered. Dr. Colan also noted Emily's history as reported by her parents: motor difficulties characterized by frequent falls, hyperactive, aggressive and frequent ear infections. The report of hyperactivity was corroborated by a report from Emily's teacher at school which described her as hyperactive, impulsive, distractible and destructive. Oddly, the teacher's report stated that the disordered behavior abruptly ceased after Christmas.

Dr. Boll saw Emily in May 1994. Dr. Boll noted Emily's history of ear infections, upper respiratory infections and yeast infections. Emily's parents reported that Emily had attentional difficulties, was moody and hyperactive. Dr. Boll's examination revealed mild motor weakness, mild sensory perceptual abnormalities and significant limitations in incidental memory processes, all suggestive of mild neurodevelopmental delays in these mechanisms. Similarly, Emily's cognitive functioning was found to be below what would be expected given her IQ, also suggesting some developmental difficulty. Finally, Dr. Boll noted mild inattentiveness.

Emily was examined by the Sparks Center evaluation team in September 1995. The evaluation team found that Emily displayed gross motor clumsiness and hypotonia throughout. Although a firm diagnosis could not be made because additional information was needed, Emily's behavioral assessment yielded consistent evidence of ADHD. Other than those noted, the Sparks team concluded that Emily did not have any neurological impairment and specifically found her cognitive functioning to be "high average."

Dr. Boll saw Emily for the second time on June 18, 1997. At this time Dr. Boll diagnosed Emily as suffering from ADHD. In contrast to his previous findings, Dr. Boll found that "no evidence of neurocognitive deficit could be seen" in Emily. For that reason, Dr. Boll suggested that Emily not be medicated for her ADHD. Dr. Boll made no additional findings as to whether Emily had any gross motor impairment. At trial, however, Dr. Boll stated that Emily was "at-risk" for such problems.

Emily's mother testified at the trial. She stated that Emily continued to suffer balance problems, attentional problems and was impulsive and aggressive. Also, Mrs. Roberts testified that Emily had exhibited gastrointestinal difficulties from toddler age characterized by vomiting and nausea.

▮ After carefully considering the testimony and reports of these various doctors and Mrs. Roberts and all other relevant evidence, the Court finds that Emily has the following relevant injuries: (1) pain and suffering associated with the tampering incidents at Maxwell Hospital; (2) ADHD; and (3) gastrointestinal problems.[25]

Dr. Colan could not testify to a reasonable degree of medical certainty that Emily was injected with lidocaine. Emily's heart rate did not fall low enough to be termed "bradycardia," and tests were not run to establish whether Emily had acidosis or hyperglycemia. Dr. Colan testified that he suspected that Emily had been given a smaller dose of lidocaine and/or that the method of administration had differed, but that without the missing indicators of lidocaine poisoning, he could not so testify to a reasonable degree of medical certainty.

Dr. Walsh stated that while Emily's symptoms at Maxwell Hospital were "suspicious," they were compatible with organic pathology. Like many of the other plaintiffs, Emily displayed symptoms of infection. In addition to the possibility of infection, Emily's medical records from Maxwell indicate that a diagnosis of probable viral pneumonia was made.

After carefully weighing all of the relevant evidence, the Court cannot find that it is

---

**25.** The Court opts not to list Emily's ear and other infections as an injury as the Court has previously noted that no causal link can be made between these infections and lidocaine poisoning.

more likely than not that Emily's injuries were proximately caused by the defendant's negligence.[26] Accordingly, the Court finds that judgment is due to be granted for the defendant and against Emily and her parents. A judgment in accordance with this opinion will be entered separately.

### I. John Roberts

John developed a fever on his second day of life, but tests revealed he did not have an infection. Later that day, John suddenly began vomiting and became deeply cyanotic. Not surprisingly, Beckelic was with John at the time of this event. An hour later, John became red, then pale and then went limp and became abruptly acidotic. Unfortunately, John was left in Beckelic's care. A short time later, John had another "crash." He began grunting and breathing rapidly, his heart rate dropped severely, he was acidotic and a tube was put in his throat to help him breathe. Medicine was given to speed John's heart and it worked a little too well—he developed ventricular tachycardia, essentially a runaway heart. John was given lidocaine to slow his heart. John was then transferred to BMC where he was at first jittery and later began experiencing seizures. Tests revealed that John was hyperglycemic.

Dr. Colan examined John in September 1992. Dr. Colan found that John's primary area of impairment was in his speech. He diagnosed John as suffering from dysarthria—very poorly articulated speech. Dr. Colan also noted that John was inattentive.

Dr. Boll first saw John approximately two years later. John's parents reported a history of inattentiveness, speech and memory problems, gastrointestinal troubles and frequent ear infections. Dr. Boll's examination revealed that John had substantial language difficulties; he was dysnomic. John's sensory perceptual examination revealed inconsistency suggestive of attentional difficulties and generalized neurological developmental delay. His motor examination revealed some clumsiness, inefficiency in complex problem solving and mild right upper extremity slowness. Dr. Boll also found that John's complex cognitive processing was managed moderately inefficiently. Dr. Boll concluded that it was imperative that John be reexamined so that the relationship between John's observed difficulties and normal fluctuations in development could be determined.

In August 1995, John was seen by Dr. Charles N. Onufer. Dr. Onufer found that John did not display any language difficulties and that his motor abilities were above average. The only impairment Dr. Onufer noted was with John's sequential processing.

Dr. Boll's second examination of John on June 5, 1997, revealed that John's overall performance had improved in many respects. However, Dr. Boll noted the continued presence of language difficulties. John's motor examination showed some mild left-sided weakness, but generally adequate fine and gross motor coordination. Finally, Dr. Boll reported that John's parents had seen increases in distractibility which, in Dr. Boll's opinion, warranted further monitoring.

At trial, Dr. Boll testified that he could not "diagnose" John with any problems but that he was "at-risk" in a number of areas: sensory-perceptual delays, attentional problems, and language. Also, Dr. Boll noted that John had an odd hand posture. Dr. Boll stated that the strength of John's hand had been tested directly and the test had shown John's left-sided weakness. Finally, Dr. Boll testified that John's language delay required monitoring and/or intervention.

---

**26.** Ironically, Emily's case fails because her injuries were less severe than many of the other plaintiffs. The Court believes that if Emily displayed a wide range of the sequelae that Dr. Colan has associated with lidocaine poisoning, there would be sufficient evidence to draw an inference of lidocaine poisoning even in the absence of testimony to a reasonable degree of medical certainty from Dr. Colan. A wide range of such sequelae together with the presence of Beckelic at both of Emily's "crashes," the fact that Emily displayed some of the core lidocaine poisoning symptoms, the fact that Emily was not tested for the other core symptoms of lidocaine poisoning rather than an affirmative indication that these symptoms were not present in Emily and the fact that none of defendant's experts have explained how an infection or virus can cause the range of neurological injuries found in the plaintiffs would be sufficient to create an inference of lidocaine poisoning. The Court feels strongly, however, that Emily has not presented enough evidence to make this inference.

■ After carefully considering the reports and testimony of these doctors and all other relevant evidence, the Court finds that John has the following relevant injuries: (1) pain and suffering associated with his "crash" at Maxwell Hospital and subsequent seizures at BMC; (2) language impairment; (3) mild left-sided motor impairment; and (4) generalized central nervous system impairment.

John displayed the core pattern of symptoms which Dr. Colan has identified as the footprint for lidocaine poisoning. Dr. Colan testified to a reasonable degree of medical certainty that John's "crash" at Maxwell Hospital was caused by lidocaine poisoning. Dr. Walsh believed that John's "crash" had no medically explainable cause. Dr. Walsh also opined that he believed John's "crash" caused him to suffer severe and probably permanent central nervous system damage. Dr. Stigelman also expressed the opinion that John's "crash" was consistent with lidocaine intoxication.

In response, the defendant again asserts that John's initial crash was caused by infection, possibly pneumonia. However, in John's case, the defendant buttresses its argument that lidocaine did not cause John's crash by pointing to the fact that John received a therapeutic dose of lidocaine to slow his racing heart. According to Dr. Snead, "lidocaine toxicity is excluded as a contributing factor by the fact that this child responded to a therapeutic dose of lidocaine ... [s]uch would not have been the case had he been intoxicated with this drug to begin with."

Plaintiffs' expert did not directly address Dr. Snead's contention. However, it was no secret that John had received a therapeutic dose of lidocaine. All three doctors, Drs. Colan, Walsh and Stigelman, certainly knew that John had been treated with lidocaine. Nevertheless, all three doctors still believed that John's "crash" was consistent with lidocaine intoxication; none ruled out lidocaine simply because John had been treated with a therapeutic dose. Moreover, while Dr. Snead has flatly stated that the effectiveness of a subsequent therapeutic dose of lidocaine rules out lidocaine intoxication as the initial cause of John's crash, he has not explained how or why this is so. While the Court does not purport to be a medical expert, its general understanding of lidocaine is that it slows the heart. Why, then, would it not effectively slow John's heart the second time around? Finally, defendant's experts have not explained what, if not lidocaine, could be responsible for John's neurological injuries. Injuries which, not coincidentally, happen to be shared by other plaintiffs poisoned with lidocaine.

Accordingly, the Court finds that John's crash was proximately caused by lidocaine poisoning. Dr. Colan has testified there is a reliable scientific basis upon which to conclude that lidocaine poisoning can cause injury to the central nervous system resulting in speech and motor impairment. On the basis of this testimony, the Court finds that all of John's relevant injuries were proximately caused by defendant's negligence.

■ Defendant asserts that John's administrative FTCA claim, filed September 8, 1992, was not filed within the two-year statute of limitations. The evidence is in conflict as to when John's parents learned that anything suspicious had occurred at Maxwell Hospital. Defendant asserts that the Roberts spoke with Dr. Sadick on January 16, 1989, and were informed at that time that an investigation was taking place at Maxwell. Dr. Sadick testified that his notes memorialized just such a meeting, but he did not indicate whether he told the Roberts an investigation was being made into the events at Maxwell. Mrs. Roberts, on the other hand, testified that the only conversation she ever had with any medical officer or staff from Maxwell Hospital was just before John was transferred to BMC and that the substance of the conversation was that John had pneumonia. Mrs. Roberts stated that she was called several times by individuals who did not identify themselves who requested that she sign some release form so that they could review John's blood work. According to Mrs. Roberts, these individuals told her that the review was just a formality—one of those things that went along with being a patient. Finally, Mrs. Roberts testified emphatically that she was never told about an OSI investigation and that she first found out that "something happened" at Maxwell in 1992.

The Court believes that John's parents did not have sufficient information to link John's injuries to defendant's acts. The Court finds that John's parents did not know an investigation was being conducted into the events at Maxwell until 1992. Furthermore, John's parents were misled, albeit probably not intentionally, into believing John's "crash" was the result of pneumonia rather than tampering. Accordingly, the Court finds that none of John's claims are barred by the statute of limitations.

Having found that John has injuries proximately caused by the defendant's negligence, the Court turns to the issue of damages. John's parents seek to recover the sum of $8,907.58 for past medical expenses and travel expenses attendant thereto. The Court finds that this sum was expended for reasonable and necessary medical expenses and, therefore, John's parents are entitled to recover the same from the defendant. Additionally, John's parents seek to recover $2,142.67 for wages lost as the result of taking John to his medical appointments. The Court finds that John's parents are entitled to recover this sum from the defendant. John also seeks to recover for the future medical treatment, care and services reasonably necessary to address his injuries. The Court has carefully considered the conflicting testimony of plaintiffs' and defendant's experts as well as all other evidence relevant to the issue of reasonable and necessary future medical expenses, and, on the basis of this evidence, the Court finds that John is entitled to recover the sum of $63,350.00 from the defendant.

The Court finds that John has established that the defendant has caused him permanent neurological injury. Furthermore, the Court finds that John has provided the Court with a reasonable basis from which to make an award of damages for lost earning capacity. Based upon the opinion of Dr. Randall McDaniel and the economic calculations made by Dr. Hebert, the Court finds that John is entitled to recover $98,242.00 for lost earning capacity.

John's parents seek to recover $1,236.00 for the loss of household services caused by John's injuries. John's parents rely on the opinions of Dr. McDaniel regarding John's ability to contribute to household services

and Dr. Hebert's economic calculation to arrive at this sum. On the basis of Dr. McDaniel's and Dr. Hebert's testimony, the Court finds that John's parents are entitled to recover $1,236.00 from the defendant for lost household services.

██ Finally, John seeks to recover for the pain, suffering and mental anguish he has, and will continue to suffer. John is entitled to recover for the pain and suffering he was put through as a result of the initial tampering at Maxwell Hospital. John remained hospitalized for over three weeks suffering from seizures and jitteriness. Undoubtedly, he received a great deal of poking and prodding during this time. John's motor difficulties are, for the time being, relatively minor, but, of course, the future is uncertain. John has worked hard to improve his language and has made substantial progress. Nevertheless, there can be significant anguish associated with a speech disorder, particularly as a child and adolescent. John has recently showed some signs of academic difficulty. Only time will tell whether these signs are a further reflection of John's neurological impairment or simply a phase. In light of these considerations, the Court finds that John is entitled to recover $1,000,000.00 from the defendant for past and future pain, suffering and mental anguish. Thus, in summary, the Court finds that judgment is due to be entered in favor of John and against the defendant for the sum of $1,173,878.25. A judgment in accordance with this opinion will be entered separately.

### J. Asia Sharpe

Asia was a small baby who exhibited some decline in fetal heart tones and had some meconium in the amniotic fluid, but appeared reasonably vigorous at birth. A few hours after her birth, Asia was found to have a persistent elevated respiratory rate and medical personnel became concerned about the possibility of infection. Asia was given oxygen. A septic work-up was done and an IV line started.

Asia's first "crash" occurred approximately thirteen hours later. Her father found Asia immobile, blue and gasping for breath. She did not respond to initial stimulation. Asia

was intubated and then vomited. About fifteen minutes later, Asia became stable.

Asia "crashed" again only minutes later. She became cyanotic, her heart rate dropped and she had to be intubated again. Tests revealed that Asia had profound metabolic acidosis. Medication was administered to improve Asia's heart rate. Although Asia's breathing and heart rate improved she continued to be acidotic over the next hour. Asia was transferred to BMC where it was noted that Asia was having seizures.

Dr. Colan saw Asia in March 1994. Dr. Colan found that Asia's speech was significantly impaired. He found that Asia suffered from cerebral palsy, had right-sided hemiparesis and, consequently, Asia's motor function was abnormal. Dr. Colan described Asia as "tragically very abnormal in terms of her overall mental faculties." He stated that every aspect of Asia's mental capacity was affected. Dr. Colan diagnosed Asia as being moderately mentally retarded. Finally, Dr. Colan noted that Asia had a history of constipation and two peculiar bald spots on her head.

Asia was seen at Walter Reed Hospital for a neurology follow-up visit on August 11, 1994. A neurological examination revealed that Asia's mental status was normal for her age, that her motor abilities were normal with strong right-hand dominance and that her sensory perception was normal. However, the overall impression of Asia was that she suffered from cerebral palsy with cognitive developmental delay and that she was at an increased risk of developing seizures.

Dr. Boll first examined Asia in October 1994. Dr. Boll's examination of Asia revealed that Asia clearly had generalized and significant neurocognitive deficits. Asia had difficulty with higher cognitive processing and memory function. Asia's motor examination revealed marked bilateral motor weakness, slowness and incoordination. Dr. Boll found Asia's sensory perceptual abilities to be impaired. Asia's general and intellectual functioning was found to be in the bottom one percent of the general population, in the range of mild mental deficiency and consistent with sustained neurological injury. Asia displayed significant language impair-

ment. Dr. Boll also noted that Asia had been diagnosed with cerebral palsy.

The Sparks Center evaluation team saw Asia in September 1995. In summary, the team found that Asia displayed pre and postnatal growth retardation, several dysmorphic features including the two peculiar bald-spots on her head, mild neuromotor dysfunction and mild mental retardation. Also noted was the fact that Asia suffered from chronic constipation which had not responded well to treatment. The evaluation team found that Asia's language skill were far below average but concluded that she did not have a language disorder. The team stated that Asia did not display clinical symptoms for ADHD despite the fact that Asia's parents had reported a wide range of behavior problems, including attention problems.

Dr. Boll saw Asia for the second time on June 19, 1997. The results of his testing showed that Asia continued to have an IQ that fell within the range of mild mental deficiency, significant language impairment, right-sided hemiparesis with consequent motor and sensory-perceptual difficulties. Asia's higher cognitive processing was inconsistent, she displayed general cognitive slowness and severe memory impairments. Dr. Boll concluded that Asia's overall pattern was consistent with generalized neurocognitive deficit.

Asia's mother, Deborah, testified at trial. Mrs. Sharpe described Asia's time at BMC as one of great discomfort because Asia was "full of tubes and punctures."

 After carefully considering the testimony and reports of these doctors and Mrs. Sharpe and all other relevant evidence, the Court finds that Asia has the following relevant injuries: (1) pain and suffering associated with the "crashes" she had at Maxwell Hospital and the seizures she experienced and the treatment she received at BMC; (2) mild mental retardation and cognitive impairment; (3) cerebral palsy (4) right-sided hemiparesis and consequent motor impairment; (5) gastrointestinal problems; (6) sensory perceptual impairment; (7) bald spots or "congenital alopecia"; and (8) generalized neurocognitive impairment.

Dr. Colan has testified to a reasonable degree of medical certainty that Asia's "crashes" were caused by lidocaine poisoning. Once again, Dr. Colan relies on the fact that Asia displayed the lidocaine poisoning footprint: bradycardia, acidosis, apnea, hyperglycemia and cyanosis.[27] Dr. Colan's assessment is consistent with the opinions of both Drs. Walsh and Stigelman.

In addition to its across-the-board assertion that Asia and the rest of the plaintiffs' "crashes" were the result of infection,[28] the defendant points to the meconium found in Asia's amniotic fluid as evidence that Asia's injuries, or the processes which resulted in Asia's injuries, were pre-natal. Dr. Roberts testified that meconium staining is a hallmark of intrauterine compromise and stress on the fetus. Dr. Roberts concluded that the meconium staining in combination with other early indicators of infection noted in Asia's medical records explained Asia's "crashes."

Dr. Colan responded by pointing out that meconium staining was not in and of itself a sign of injury and that it occurs in approximately 18% of all normal deliveries. Dr. Colan went on to explain that if Asia had suffered enough pre-natal distress to cause the severe injuries she exhibits (CP, mental retardation, etc ...), she would have presented a very different picture upon birth. She would have been "very sick" and, according to Dr. Colan, Asia's medical records are inconsistent with such a finding. Dr. Colan

testified that if Asia's injuries had their genesis in some in-utero distress she would never have been described as alert, and would have been in some degree of a coma. Moreover, Dr. Colan testified that such a clinical picture, known as HIE (hypoxic ischemic encephalopathy) would not result in hyperglycemia and sustained metabolic acidosis. In conclusion, Dr. Colan stated, "[m]econium staining and asphyxia causing this baby's problem is not consistent by any stretch of the imagination with these facts ."

 The Court believes that Dr. Colan has adequately rebutted the testimony of Dr. Roberts, and, as the Court has previously noted, believes that infection alone was not the cause of Asia and the other plaintiffs' "crashes." Accordingly, the Court finds that Asia's "crashes" at Maxwell Hospital were caused by lidocaine poisoning and proximately caused by defendant's negligence.[29] Dr. Colan has testified to a reasonable degree of medical certainty that Asia's other injuries with the exception of the gastrointestinal problems and the congenital alopecia are caused by lidocaine poisoning. The Court has previously found that lidocaine poisoning causes gastrointestinal problems. The Court finds that Asia has not proved it more likely than not that her congenital alopecia was caused by Beckelic's tampering. Accordingly, with the exception of congenital alopecia, the Court finds that all of Asia's relevant

---

27. Initially, Dr. Colan based his opinion in part on a urine screen which showed lidocaine in Asia's bloodstream. Defendant argued that the lidocaine in Asia's blood was the product of a therapeutic dose received by Mrs. Sharpe during Asia's delivery. At first Dr. Colan testified that the injection given to Mrs. Sharpe could not be responsible for the positive screen. However, after reviewing the records and making further calculations, Dr. Colan later refined his opinion and stated that the lidocaine in Asia's blood could possibly have resulted from a trans-placental transfer of lidocaine from Mrs. Sharpe to Asia.

28. The Court reiterates one final time that defendant's assertion that the plaintiffs had infection is not inconsistent with Dr. Colan's testimony on causation. Dr. Colan believes that Beckelic may have targeted infants with signs of infection to reduce his risk of discovery. More importantly, however, it is Dr. Colan's testimony that the plaintiffs' poisoned by lidocaine have a combination of symptoms which could not be caused by

infection. In other words, infection and lidocaine poisoning are not mutually exclusive and Dr. Colan believes that in many of the plaintiffs there is evidence of both.

29. Defendant also argues that Asia's injuries may be attributable to a genetic disorder called Velo–Cardio–Facial (VCF) or Shprintzen Syndrome. Defendant's expert, Dr. Paul Fernhoff, examined Asia on July 31, 1997, and noted that she had a number of indicators for VCF. Dr. Fernhoff ran genetic tests on Asia to confirm his suspicions. While the Court does not have the results of those tests before it, the Court has received the affidavit of Mrs. Sharpe wherein she states that Dr. Fernhoff informed her that the genetic testing was negative, indicating that Asia does not have VCF. If Mrs. Sharpe's representations prove to be untrue, the defendant is invited to petition the Court to address this issue in light of Dr. Fernhoff's findings.

injuries were proximately caused by defendant's negligence.

■ Defendant contends that Asia cannot recover because the statute of limitations had run by the time she filed an FTCA administrative claim on February 3, 1994. Mrs. Sharpe testified that she spoke with the Maxwell Hospital Commander in December 1988, or January 1989 and that she was told at that time that it was suspected that "foul play" had occurred while Asia was in the hospital. Mrs. Sharpe went on to testify that she spoke with agents from the OSI in January 1989, who told her that an investigation was taking place at Maxwell and that it was suspected that Beckelic had injected infants with lidocaine. The OSI agents allegedly told Mrs. Sharpe that they would inform her of the findings from their investigation. Mrs. Sharpe claims that she had a second meeting with OSI agents. Mrs. Sharpe testified that at this second meeting she was told that Asia was not involved in the investigation taking place at Maxwell and that the matter was closed. She stated that the OSI agents basically told her to "have a nice life." Mrs. Sharpe stated that on the basis of the OSI agents' representations she believed that there was no link between anything that happened at Maxwell and Asia's injuries. According to Mrs. Sharpe, she did not learn that there was a possible link between the defendant and Asia's injuries until December 1993, when an uncle showed her a newspaper article discussing the incidents at Maxwell Hospital.

On the basis of Mrs. Sharpe's testimony, the Court finds it more likely than not that Asia's parents were intentionally or accidentally led, by the defendant, to believe that there was no causal link between defendant and Asia's injury. The Court further finds that Asia's parents acted reasonably in relying on the defendant's representations. Therefore, the Court finds that Asia neither knew, nor should she reasonably have known, that there existed a causal link between the defendant and Asia's injuries. Accordingly, the Court finds that the statute of limitations does not bar any of Asia's claims.

Having found that Asia has suffered injuries proximately caused by the defendant, the Court turns to the issue of damages. Asia's parents seek to recover $93,685.77 for past medical and travel expenses, and the value of attendant care. The Court finds that the evidence supports an award of $93,-474.00 as compensation for the cost of past reasonable and necessary past medical services, travel and attendant care. The Court has carefully considered the conflicting testimony of plaintiffs' and defendant's experts as well as all other evidence relevant to the issue of reasonable and necessary future medical expenses, and, on the basis of this evidence, the Court finds that Asia is entitled to recover the sum of $1,760,000.00 from the defendant.

The Court finds that Asia has established that the defendant has caused her permanent neurological injury. Furthermore, the Court finds that Asia has provided the Court with a reasonable basis from which to make an award of damages for lost earning capacity. Based upon the opinion of Dr. Randall McDaniel and the economic calculations of Dr. Hebert, the Court finds that Asia is entitled to recover $447,386.00 for lost earning capacity.

Asia's parents seek to recover $30,487.00 for the loss of household services caused by Asia's injuries. Asia's parents rely on the opinions of Dr. McDaniel regarding Asia's ability to contribute to household services and Dr. Hebert's economic calculation to arrive at this sum. On the basis of Dr. McDaniel's and Dr. Hebert's testimony, the Court finds that Asia's parents are entitled to recover $25,000.00 from the defendant for lost household services.

■ Finally, Asia seeks to recover for the pain, suffering and mental anguish she has, and will continue to suffer. Asia is entitled to recover for the significant pain and suffering she was put through as a result of the initial tampering at Maxwell Hospital. Asia's injuries are permanent and of the most severe nature. Asia's life experience has been dramatically altered by the defendant's negligence. That is not to say that Asia cannot have a good and fulfilling life—she can and the Court expects that she will. However, that life, through no choice of her own, will be extremely limited in many respects. Asia will forever function physically, mentally and socially, on a much lower level than her

peers. In light of these considerations, the Court finds that Asia is entitled to recover $10,000,000.00 from the defendant for past and future pain, suffering and mental anguish. Thus, in summary, the Court finds that judgment is due to be entered in favor of Asia and her parents and against the defendant for the sum of $12,325,860.00. A judgment in accordance with this opinion will be entered separately.

### K. Quinton Warrick

Upon arrival into the world, Quinton's limbs were noted to be a bit cyanotic, but overall Quinton was judged to be vigorous and doing well. Around four A.M. Quinton was found to be lethargic and appeared cyanotic. Quinton was given oxygen, a sepsis work-up was done and an IV started. About two hours later, Quinton began grunting and became completely cyanotic. His heart rate dropped dangerously low and he was unresponsive. Quinton was intubated and given medication to speed up his heart. Tests revealed that he was acidotic and hyperglycemic. Quinton was transferred to BMC where he displayed an abnormal EEG.

Dr. Colan examined Quinton in December 1993. Dr. Colan found that Quinton had a multiplicity of abnormal neurological findings. Quinton displayed an unusual arm flapping and intense coarse tremor. Dr. Colan noted that both Quinton's teachers and parents had indicated that Quinton's development in terms of learning and focus was impaired. Quinton was found to have extraordinary problems with hyperactivity, inattentiveness and a degree of aggressive difficulties.

Dr. Boll first saw Quinton in August 1994. Quinton's parents told Dr. Boll that they saw Quinton as moody, distractible, overactive and highly aggressive. Dr. Boll's examination revealed that Quinton had a language impairment and difficulty in utilizing complex problem solving skills efficiently. Sensory perceptual and motor testing revealed impairment, Quinton's left-side was weak and slow. Quinton's higher cognitive processing displayed difficulties with short-term, tactile and kinetic memory. Dr. Boll stressed that while Quinton seemed to be making adequate progress, given Quinton's neurocognitive impairment, he was at substantial risk.

The Sparks Center evaluation team examined Quinton in October 1995. The team recorded that Quinton's medical history included numerous upper respiratory infections, ear infections and pneumonia. A heart murmur and irregular rhythm were detected. Quinton was found to have average cognitive abilities, average language abilities and average motor skills. The team's tests strongly suggested that Quinton had ADHD, but the team was unwilling to make a diagnosis without additional information.

Quinton made his second visit to Dr. Boll on June 12, 1997. Quinton's mother reported that Quinton continued to be aggressive and overactive. Dr. Boll's examination revealed a twenty point drop in one measure of IQ. Quinton's language functioning was average. Some gross motor difficulties were observed. Dr. Boll found that Quinton's memory problems persisted. At trial, Dr. Boll testified that he believed a diagnosis of ADHD was warranted for Quinton. Additionally, Dr. Boll emphasized that Quinton's decrease in IQ was a significant sign of trouble to come.

■ After carefully considering the testimony and reports of these doctors and all other relevant evidence, the Court finds that Quinton has the following relevant injuries: (1) pain and suffering associated with his "crash" at Maxwell Hospital; (2) ADHD and behavior difficulties; (3) mild motor impairment; and (4) cognitive impairment.

Dr. Colan opined to a reasonable degree of medical certainty that Quinton's "crash" was caused by lidocaine poisoning. Quinton displayed all the symptoms of the lidocaine poisoning footprint. The defendant offered only its previously rejected infection theory for Quinton's crash. After reviewing the testimony and evidence relevant to Quinton's "crash," the Court finds that Quinton's "crash" was the result of lidocaine poisoning. Dr. Colan has testified to a reasonable degree of medical certainty that Quinton's other injuries can be caused by lidocaine poisoning. The defendant has not offered any evidence which persuades the Court that lidocaine poisoning did not cause these other injuries. Accordingly, the Court finds that all of Quinton's relevant injuries were proximately caused by the defendant.

■ The defendant argues that Quinton's claims are barred by the statute of limitations. Quinton did not file an FTCA administrative claim until December 23, 1993. The defendant has adduced evidence which demonstrates that by January 1989, Quinton's parents were aware that an investigation was being conducted into the events at Maxwell Hospital and that it was suspected that the infants may have been injected with something. Based on this evidence the Court finds that Quinton is precluded from recovering for the "crash" he suffered at Maxwell Hospital.

■ It remains to be decided, however, when Quinton's parents should have discovered his other relevant injuries. Dr. Boll has testified that ADHD cannot be identified until a child reaches the age of three to four. Dr. Colan has testified that the manifestations of neurological injury may take years to manifest or become recognizable. On the basis of this testimony, the Court finds that Quinton's other relevant injuries were neither known nor discoverable until Quinton reached the age of three or four. While this timeline still leaves a question as to whether Quinton filed his claim before the statute of limitations had run, because the statute of limitations is an affirmative defense and the defendant has failed to produce affirmative evidence dating the discovery of these later injuries outside the two-year statute of limitations window, the Court finds that Quinton may recover for these later injuries.

Having found that Quinton has injuries proximately caused by the defendant, the Court turns now to the issue of damages. Quinton's parents seek to recover $4,124.96 for past medical and travel expenses. The Court finds that Quinton's parents expended this sum for reasonable and necessary medical services and attendant travel, and that they are entitled to recover the same. The Court has carefully considered the conflicting testimony of plaintiffs' and defendant's experts as well as all other evidence relevant to the issue of reasonable and necessary future medical expenses, and, on the basis of this evidence, the Court finds that Quinton is entitled to recover the sum of $69,811.00 from the defendant.

The Court finds that Quinton has established that the defendant has caused him permanent neurological injury. Furthermore, the Court finds that Quinton has provided the Court with a reasonable basis from which to make an award of damages for lost earning capacity. Based upon the opinion of Dr. Randall McDaniel and the economic calculations of Dr. Hebert, the Court finds that Quinton is entitled to recover $854,788.00 for lost earning capacity.

Quinton's parents seek to recover $4,942.00 for the loss of household services caused by Quinton's injuries. Quinton's parents rely on the opinions of Dr. McDaniel regarding Quinton's ability to contribute to household services and Dr. Hebert's economic calculation to arrive at this sum. On the basis of Dr. McDaniel's and Dr. Hebert's testimony, the Court finds that Quinton's parents are entitled to recover $4,942.00 from the defendant for lost household services.

■ Finally, Quinton seeks to recover for the pain, suffering and mental anguish he has, and will continue to suffer. Currently, Quinton's primary difficulty lies in the area of inattentiveness/hyperactivity and aggression. This impairment prevents Quinton from staying on task and, consequently, he will tend to function at a lower level of efficiency than he could otherwise achieve. Unless Quinton can be successfully treated, this impairment will cast an ever greater shadow over Quinton as he passes through the trying adolescent years and into adulthood. Quinton's cognitive impairment appears to be worsening and Dr. Boll warned that Quinton's recent drop in IQ is a very bad sign. Quinton certainly appears to be in for some trying times ahead. In light of these considerations, the Court finds that Quinton is entitled to recover $1,000,000.00 from the defendant for past and future pain, suffering and mental anguish. Thus, in summary, the Court finds that judgment is due to be entered in favor of Quinton and his parents and against the defendant for the sum of $1,933,665.96. A judgment in accordance with this opinion will be entered separately.

### L. Cheryl Schoen

Cheryl is the lone adult among the plaintiffs. Cheryl is also the lone eyewitness to

Beckelic's insidious deed. Cheryl saw Beckelic come into her room with a syringe in his hand. She testified that she observed Beckelic tampering with her IV line and then felt an immediate burning in her hand and wrist where her IV was inserted. She had a strange feeling in her throat and with Beckelic urging her to "go with it," she passed out. During this time Cheryl ceased breathing and emergency procedures were initiated to stabilize her.

Cheryl began complaining of severe and persistent constipation shortly after the incident. Dr. Colan noted this history when he examined her Cheryl in March 1992. Additionally, Cheryl complains of pain in her stomach created by a "pulling sensation" associated with certain movements. Finally, Cheryl asserts that after the tampering incident at Maxwell she began experiencing migraine headaches.

■ After a careful review of all the evidence, the Court finds that Cheryl's relevant injuries are: (1) pain and suffering associated with the Maxwell Hospital tampering incident; (2) gastrointestinal distress; and (3) migraine headaches.

Cheryl displayed all the footprint symptoms of lidocaine. Dr. Colan testified to a reasonable degree of medical certainty that Cheryl's "crash" was caused by lidocaine poisoning. Dr. Colan's testimony is consistent with the opinions of Drs. Walsh and Stigelman. The Court has previously determined that lidocaine poisoning can cause gastrointestinal injury. The defendant has not suggested another possible cause for this injury. Accordingly, the Court finds that Cheryl's "crash" and gastrointestinal injury were proximately caused by the defendant. However, the Court finds that the evidence does not prove it more likely than not that Cheryl's migraine headaches were caused by lidocaine poisoning.

■ The defendant argues that Cheryl's claims are barred by the statute of limitation. As an eyewitness to Beckelic's deed, Cheryl obviously knew that her initial "crash" may have been causally linked to some act of the defendant. Moreover, it is clear from the evidence that Cheryl knew within a month or two following her incident that an investigation was being conducted into the suspected tampering which occurred at Maxwell Hospital. In fact, Cheryl testified that at her second meeting with OSI agents she was told that it was suspected that she had been injected with some drug. Finally, as noted above, Cheryl began suffering from gastrointestinal difficulties shortly after she gave birth. Therefore, the Court finds that by January 1989, Cheryl was both aware of her relevant injuries and aware of a possible causal link to the defendant.

Furthermore, the Court is convinced that Cheryl remained suspicious that there was a causal link between the tampering incident at Maxwell Hospital and her gastrointestinal problems even after she was allegedly told that by the defendant that there would be no long-term effects from the tampering. Cheryl testified that she asked for her medical records in 1990 so that her doctor could determine whether there was any connection between the Maxwell incident and her gastrointestinal impairment. This testimony demonstrates that Cheryl continued to suspect there was a link between her injuries and the defendant even after the defendant suggested otherwise.

Cheryl argues that the statute of limitations should be tolled because her efforts to investigate a causal link between the tampering incident and her injuries were thwarted by the defendant. Cheryl's argument appears to be that although she had been told that she was injected with some drug, she did not know what the drug was, and without that information, the suspected causal link could not be verified. She hoped to glean the missing information from her medical records. Cheryl claims that she requested her medical records many times but that the defendant refused to produce them.

Because Cheryl had knowledge of her injuries and a potential link to the defendant by January 1989, she had a duty to investigate this possible connection. However, Cheryl testified that she did not request her medical records until 1990. Assuming that she meant January 1990, Cheryl had allowed an entire year to pass before began her investigation. The Court finds no reason to toll the statute of limitations during that one-year period.

The evidence submitted by the defendant reveals that Cheryl had her medical records no later than December 12, 1991. Even if the statute of limitations was tolled from January 1990, to December 12, 1991, Cheryl did not timely file her FTCA administrative claim. After December 12, 1991, Cheryl had one year remaining to file her administrative claim. Cheryl did not file her administrative claim until March 30, 1993. Accordingly, the Court finds that the Court is without jurisdiction to hear Cheryl's claim and, consequently, her claim is due to be dismissed.

## CONCLUSION

This has been a difficult case. Both the plaintiffs and defendant have produced reams of competent evidence and both sides have made compelling arguments. Many of the issues, both factual and legal, could rationally be decided either way. However, after careful and lengthy consideration of the evidence, arguments of counsel and relevant law, the Court is convinced that its findings reflect the greater weight of the evidence.

There is, however, one fact in this case about which the Court is absolutely certain— Beckelic deliberately injured the plaintiffs and a number of other infants at Maxwell Hospital. The Court continues to find the Air Force's failure to prefer General Court Marshal charges against Beckelic very disturbing.[30] The Court is also troubled by the fact that the Memorandum of Understanding between the Department of Defense and the Department of Justice was not followed and that the Office of the U.S. Attorney failed to make inquiries when the matter was made known in the media. Finally, the Court notes that the victims in these cases were civilians, not members of the military, which is all the more reason the Office of the U.S. Attorney should have been consulted by the Air Force.

It is the undersigned's hope, both as a concerned citizen, as a retired Air Force general officer and as a former United States Attorney for eight years, that, in light of this and the Court's previous opinion, Maxwell Air Force Base Regional Hospital will make or has made significant and substantial improvements in its command and leadership to include its staffing practices, quality assurance and overall supervision.

## ORDER

In accordance with the foregoing Memorandum Opinion, it is CONSIDERED and ORDERED as follows:

(1) That the claims of Cheryl Schoen (a/k/a Cheryl Pretiger Toms), et al., C.A. 93–D–1395–N, be and the same are hereby DISMISSED;

(2) That the Claims of Steven Fowler, et al., C.A. 93–D–1392–N, be and the same are hereby DISMISSED;

(3) That the United States Marshall for the Middle District of Alabama cause to be personally served a courtesy copy of this opinion on:

(a) Major General Bryan G. Hawley, The Judge Advocate General of the Air Force, 1420 Air Force, Pentagon Room 4E112, Washington, DC 20330–1420.

(b) Lieutenant General Charles H. Roadman, II, Surgeon General of the Air Force, 110 Luke Ave., Room 400, Bolling Air Force Base, Washington, DC 20332–7050

(c) Lieutenant General Joseph J. Redden, the Commander of Headquarters Air University at Maxwell Air Force Base, Montgomery, AL;

(d) Colonel William S. Cole, Jr., 42nd Air Base Wing Commander at Maxwell Air Force Base, Montgomery, AL;

(e) Colonel Scott B. McLauthlin, Staff Judge Advocate for Air University at Maxwell Air Force Base, Montgomery, AL;

(f) Colonel Carlisle Harrison, Jr., Commander of the 42nd Medical Group at Maxwell Air Force Base, Montgomery, AL; and

(g) Lieutenant Colonel David F. Brash, Staff Judge Advocate for the 42nd Air Base Wing at Maxwell Air Force Base, Montgomery, AL.

---

**30.** The Court also notes that the aggregate amount of the judgments for the plaintiffs is roughly twenty-eight million dollars which, the Court is informed, is approximately the cost of a new F–16 fighter aircraft with a few million dollars left over.

Judgments in Accordance with this Memorandum Opinion and Order will be entered separately.